JoAnn STORM, individually and as the Guardian Ad Litem of A. Paul Storm, Jr., Plaintiff,

v.

NSL ROCKLAND PLACE, LLC, a Delaware limited liability company Defendant.

C.A. No. 04C–01–210–JRS.

Superior Court of Delaware, New Castle County.

Submitted: Aug. 11, 2005.
Oral Decision: Aug. 11, 2005.
Written Decision: Dec. 29, 2005.

Richard A. Zappa, Young, Conaway, Stargatt & Taylor, L.L.P., Wilmington, for Plaintiffs.

Bradley J. Goewert, Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, for Defendant.

## MEMORANDUM OPINION

SLIGHTS, J.

### I.

In this opinion, the Court considers whether an assisted living facility[1] may advance the affirmative defense of primary assumption of the risk in response to a resident's claim that the facility provided negligent or reckless care to him.[2] To the Court's knowledge, the question of whether primary assumption of the risk is a viable defense in the healthcare context has not been decided in Delaware.

A. Paul Storm, Jr. ("Mr. Storm") was a resident of a licensed assisted living facility owned and operated by Defendant, NSL Rockland Place, LLC ("Rockland").[3] On February 9, 2002, two Rockland employees found Mr. Storm in his room at Rockland lying face-down on the floor. It was presumed that Mr. Storm had fallen while alone in his room. As a result of the fall, Mr. Storm allegedly suffered serious physical injuries.

Plaintiff, JoAnn Storm, Mr. Storm's wife (collectively "the Storms"), filed this action individually and as guardian *ad litem* of Mr. Storm alleging, *inter alia*, that Rockland was negligent, reckless and wanton in the care and services it rendered to Mr. Storm. Rockland answered by denying the allegations of wrongdoing and raising Mr. Storm's primary and secondary assumption of the risk as affirmative defenses.

Arguing that primary assumption of the risk would operate as a complete bar to recovery, Rockland now seeks summary judgment. Rockland contends that Mr. Storm was aware of and expressly consented to the risks involved when residents of an assisted living facility are given appropriate opportunities to exercise independence in their day-to-day living activities. Under such circumstances, Rockland argues that injuries sustained by Mr. Storm in the course of exercising his independence may not be the subject of a claim against the institutional care provider to the extent such injuries fall within the range of foreseeable risks expressly assumed by the resident. For the reasons that follow, the Court finds that Delaware "healthcare providers" may not, as

---

1. "Assisted living facility" is defined under DEL. CODE ANN. tit. 16, § 1102(4) (2003): " 'Nursing Facility and Similar Facility' shall mean a residential facility that provides shelter and food to more than 1 person who: a. Because of their physical and/or mental condition require a level of care and services suitable to their needs to contribute to their health, comfort, and welfare; and b. Who are not related within the second degree of consanguinity to the controlling person or persons of the facility. The facilities to be licensed pursuant to Chapter 11 include ... assisted living facilities."

2. The Court rendered its decision orally in open court on August 11, 2005 with a promise that it would memorialize its findings in a written decision. This is the Court's less-than-timely fulfillment of that promise.

3. *See* Docket Item ("D.I.") 29; DEL. CODE ANN. tit. 16, §§ 1102(4), 1103.

a matter of law, invoke the affirmative defense of primary assumption of the risk in claims brought by patients alleging substandard care.[4] In the healthcare context, key elements of the defense will always be missing. Specifically, the healthcare defendant will rarely be able to establish that the plaintiff knowingly and expressly consented to engage in inherently risky conduct and will never be able to establish that the plaintiff consented to allow the healthcare provider to exercise less than ordinary care during the course of treatment. Moreover, the Court is satisfied that it would be endorsing bad public policy if it were to allow a healthcare provider to escape liability for proven negligence in rendering care on the ground that the patient purportedly consented to the risk of negligent care and consequent injury by agreeing to receive the treatment or healthcare services in the first place. Indeed, the defense is incompatible with Delaware's Healthcare Medical Negligence Act ("the Act")[5] and Delaware's Assisted Living Facilities Regulations ("the Regulations"),[6] both of which reflect a public policy that healthcare facilities (including assisted living facilities) will be held accountable for injuries sustained by patients as a proximate result of negligence, recklessness or other culpable conduct. Accordingly, Rockland's motion for summary judgment must be **DENIED**.

## II.

In January 2002, the Storms approached the intake staff at Rockland to inquire whether Rockland could provide a full-time residence for Mr. Storm where he could receive individualized medical care and twenty four hour supervision. Prior to admitting Mr. Storm, Rockland arranged for him to receive a medical evaluation so that it could prepare an initial service assessment outlining the assistance that Mr. Storm would require. The pre-admission evaluation was performed by Dr. Bean, Mr. Storm's neurologist. Dr. Bean opined that Mr. Storm suffered from multiple sclerosis, alcoholism, hypertension and depression. He noted that Mr. Storm would require assistance with ambulation due to falls and poor judgment. He also was in need of psychological and drug and alcohol rehabilitation.

With the pre-admission evaluation in hand, Rockland created a Medical Service Agreement which outlined the assistance and services it would provide to Mr. Storm while he resided at Rockland. This agreement was to remain in effect until Rockland performed its own evaluation of Mr. Storm and determined whether Mr. Storm required additional or different services. On January 10, 2002, both Mr. Storm and Rockland executed the Medical Service Agreement. Thereafter, as a final step of establishing residency at Rockland, Mr. Storm and Rockland entered into a Residency Agreement on January 26, 2002.

Mr. Storm was a resident at Rockland from January 26 through February 9, 2002. During his first week, Mr. Storm was able to ambulate with a steady gate

---

**4.** "Health care provider" is defined in Delaware's "Health Care Medical Negligence Act" to mean "a ... facility or institution licensed by this State pursuant to ... Title 16 to provide health care *or* professional services or any officers, employees or agents thereof acting within the scope of their employment...." DEL. CODE ANN tit. 18, § 6801(5) (1999) (emphasis supplied). Therefore, an as-

sisted living facility licensed under Title 16, such as Rockland, is a "health care provider" as defined by statute. *See* D.I. 29; DEL. CODE ANN tit. 16, § 1103.

**5.** DEL. CODE ANN tit. 18, §§ 6801–6865.

**6.** 40–700–047 DEL. CODE REGS. §§ 63.0–63.12 (1997).

while using a cane, eat his meals, refrain from alcohol consumption, and take his prescribed medications. His conduct, however, soon changed for the worse.

On February 1, Mrs. Storm came to Rockland to take her husband out for dinner only to find that Mr. Storm had been drinking alcohol and was intoxicated. She immediately contacted Rockland and directed its staff not to permit Mr. Storm to leave the facility without informing her because he was likely to consume alcohol and then be a danger to himself or others. According to Mrs. Storm, Rockland agreed to pay extra attention to Mr. Storm to ensure that he was in compliance with his treatment plan. In the ensuing days, however, Mr. Storm continuously would leave Rockland's campus and return intoxicated and smelling of alcohol. He also refused to take his prescribed medication and to eat many of his meals. On one occasion, when prompted by Rockland employees to take his medication, Mr. Storm responded: "I'm not in prison-I'll do what I want." According to Mrs. Storm, Rockland did not inform her of her husband's recalcitrance.

On the morning of February 9, Mr. Storm again refused to eat and take his medication and instead told a certified nursing assistant to leave him alone and that he would not be coming to breakfast or lunch. He remained in his room throughout the day. As evening approached, the Rockland staff once again attempted to coax Mr. Storm to leave his room and eat dinner. Mr. Storm did not respond. When two certified nursing assistants were dispatched to check on Mr. Storm, they found him unresponsive lying face-down on the floor. Mr. Storm apparently had fallen while alone in his room. He allegedly sustained an acute subdural hematoma and severe anoxia resulting in irreversible brain damage and permanent physical and neurological impairments and disabilities.[7]

Mrs. Storm subsequently filed a complaint individually and as guardian *ad litem* of Mr. Storm alleging medical negligence, reckless and wanton conduct, breach of statutory duties, breach of contract, and loss of consortium. Rockland's answer denied wrongdoing and alleged, *inter alia*, that Mr. Storm's claims were barred by the doctrine of primary assumption of the risk.

## III.

Rockland has moved for summary judgment. It contends that Mr. Storm's conduct constitutes primary assumption of the risk and should operate to relieve Rockland from liability. According to Rockland, Mr. Storm was aware of, and consented to, the risks associated with the independent living environment at Rockland. He exercised his independence and was injured as a result of his own conduct. In this regard, Rockland relies primarily upon the exculpatory language contained in the Residency Agreement which provides, in pertinent part:

[Rockland] is designed to provide residential living in an apartment setting combined with individualized personal assistance and 24 hour supervision. The objective of the assisted living program is to provide the supportive services needed by residents of [Rockland] to manage on their own in their daily lives and to ensure that each resident can exercise a maximum level of independence, control and choice in his or her daily life.

The Resident acknowledges that these principles of independence, control, and choice will result in a higher quality of

---

7. *See* D.I. 1; D.I. 46.

life for each resident in the community, recognizes the additional risk that results from the ability of the Resident to make such choices, and agrees to mutually accept and share this risk ...

Resident agrees that [Rockland] shall not be liable to Resident for personal injuries or damage to property, even if resulting from the negligence of [Rockland] or its employees, unless resulting from its gross negligence or willful misconduct. Resident acknowledges that the independence, control and choice afforded within [Rockland] requires that the Resident assume responsibility for any loss, injury or damage resulting from Resident's personal actions and conduct.[8]

As further support of its position, Rockland cites the "Resident Rights" section of the Residency Agreement which afforded Mr. Storm the right to leave and return to Rockland at reasonable times and the right to privacy of self and possessions.[9] According to Rockland, Mr. Storm's execution of the Residency Agreement, coupled with Mr. Storm's clear exercise of his "Resident's Rights," as demonstrated when he exclaimed "I'm not in prison-I'll do what I want" and admonished Rockland staff to "leave [him] alone," all evidence his express acknowledgment and consent of the risks inherent in living at Rockland. Rockland argues that Mr. Storm expressly assumed the risk of injury and is barred, therefore, as a matter of law, from recovery.[10]

The Storms respond by arguing that the exculpatory language contained in the Residency Agreement, and the oral statements allegedly made by Mr. Storm, do not provide a sufficient evidentiary basis for a defense of primary assumption of the risk because neither establish an express undertaking by Mr. Storm to relieve Rockland from its "specific duties." The Storms also contend that Rockland cannot rely upon the exculpatory language in the Residency Agreement as a basis for a primary assumption of the risk defense because the language undermines the essential purpose of the Act, violates the Regulations, and offends established public policy.[11]

The matter has been fully briefed and argued and is ripe for decision.

## IV.

The Court's principal function when considering a motion for summary judgment is to examine the record to determine whether genuine issues of material fact exist.[12] Summary judgment will be granted if, after viewing the record in a light most favorable to the non-moving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[13] If, however, the record reveals that material facts are in dispute, or if judgment as a matter of law is not appropriate, then summary judgment will not be granted.[14]

The moving party bears the initial burden of demonstrating that the undisputed facts support his legal claims.[15] If the

8. D.I. 46, Ex. D.

9. *Id.*, Ex. E.

10. *See* D.I. 46.

11. *See* D.I. 49.

12. *Oliver B. Cannon & Sons, Inc. v. Dorr–Oliver, Inc.*, 312 A.2d 322, 325 (Del.Super.Ct.1973). *See also* Super. Ct. Civ. R. 56.

13. *Id.*

14. *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del.1962).

15. *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979) (citing *Ebersole*, 180 A.2d at 470).

motion is properly supported, the burden shifts to the non-moving party to demonstrate that there are material issues of fact for resolution by the ultimate fact-finder or, in the case of a defense motion, that the defense(s) raised are legally deficient.[16] When reviewing the record, the Court must view the evidence in the light most favorable to the non-moving party.[17]

## V.

### A. Primary Assumption of the Risk As a Matter of Law

 From a legal perspective, liability in negligence will first depend upon whether the defendant was under a legal obligation, or duty, "to protect the plaintiff from the risk of harm which caused his injuries."[18] Determining *vel non* a duty exists is a question of law to be decided by the Court through " 'reference to the body of statutes, rules, principles and precedents which make up the law[.]' "[19] If the Court finds that the defendant owed no duty of care to the plaintiff at the time he sustained his injuries, the defendant is entitled to summary judgment as a matter of law.[20]

 When a defendant invokes the affirmative defense of primary assumption

of the risk, the Court must evaluate the viability of the defense as part of its duty analysis because primary assumption of the risk "obviates the duty owed by the defendant."[21] Stated differently, a finding by the Court that a plaintiff expressly assumed a risk in a manner that would implicate primary assumption of the risk is tantamount to a finding that the defendant owed no duty to the plaintiff. Needless to say, if the defendant establishes that it owed no duty to the plaintiff, *ipso jure*, it has established that it is entitled to summary judgment as a matter of law.

### B. Primary Versus Secondary Assumption of the Risk

Assumption of the risk historically has operated to bar recovery when a plaintiff voluntarily assumed a risk of harm arising from a defendant's negligent or reckless conduct.[22] The term "assumption of risk" has morphed into a concept with differing meanings depending on the facts of the case and the particular jurisdiction's approach to the defense of contributory negligence. Indeed, commentators have identified at least four different applications of the concept in the body of case law that has developed over the years:

16. *See Brzoska v. Olson,* 668 A.2d 1355, 1364 (Del.1995).

17. *See United Vanguard Fund, Inc. v. Takecare, Inc.,* 693 A.2d 1076, 1079 (Del.1997); *Brzoska,* 668 A.2d at 1364.

18. *Fritz v. Yeager,* 790 A.2d 469, 471 (Del. 2002).

19. *Id.* quoting PROSSER & KEETON ON TORTS, § 37 (5th ed. 1984). *See also Butler v. Newark Country Club, Inc.,* C.A. No. 02C–11–072, 2005 WL 2158637, at *3 (Del.Super.Ct. Aug. 29, 2005) ("The existence of a duty is a pure question of law appropriate for summary judgment."); *Shepard v. Reinoehl,* 830 A.2d 1235, 1238 (Del.Super.Ct.2002) ("Whether or

not a duty of care exists ... is a question of law to be decided by the Court.").

20. *Kananen v. Alfred I. DuPont Inst. of the Nemours Found.,* 796 A.2d 1, 4 (Del.Super.Ct.2000).

21. *Croom v. Pressley,* C.A. No. 93C–01–026, 1994 WL 466013, at *5 (Del.Super.Ct. July 29, 1994). *See also Kaplan v. Exxon Corp.,* 126 F.3d 221, 225 (3d Cir.1997).

22. RESTATEMENT (SECOND) OF TORTS § 496A (1965). *See also Croom,* 1994 WL 466013, at *5 ("Assumption of the risk is a voluntary undertaking of certain risk of harm arising from the negligent or reckless conduct of the defendant.").

1. In its simplest form, assumption of risk means that the plaintiff has given his express consent to relieve the defendant of an obligation to exercise care for his protection, and agrees to take his chances as to injury from a known or possible risk. The result is that the defendant, who would otherwise be under a duty to exercise such care, is relieved of that responsibility, and is no longer under any duty to protect the plaintiff.

2. A second, and closely related, meaning is that the plaintiff has entered voluntarily into some relation with the defendant which he knows to involve the risk, and so is regarded as tacitly or impliedly agreeing to relieve the defendant of responsibility, and to take his own chances. Thus a spectator entering a baseball park may be regarded as consenting that the players may proceed with the game without taking precautions to protect him from being hit by the ball. Again the legal result is that the defendant is relieved of his duty to the plaintiff.

3. In a third type of situation, the plaintiff, aware of a risk created by the negligence of the defendant, proceeds or continues voluntarily to encounter it. For example, an independent contractor who finds that he has been furnished by his employer with a machine which is in dangerous condition, and that the employer, after notice, has failed to repair it or to substitute another, may continue to work with the machine. He may not be negligent in doing so, since his decision may be an entirely reasonable one, because the risk is relatively slight in comparison with the utility of his own conduct; and he may even act with unusual caution because he is aware of the danger. The same policy of the common law which denies recovery to one who expressly consents to accept a risk will, however, prevent his recovery in such a case.

4. To be distinguished from these three situations is the fourth, in which the plaintiff's conduct in voluntarily encountering a known risk is itself unreasonable, and amounts to contributory negligence. There is thus negligence on the part of both plaintiff and defendant; and the plaintiff is barred from recovery, not only by his implied consent to accept the risk, but also by the policy of the law which refuses to allow him to impose upon the defendant a loss for which his own negligence was in part responsible.[23]

For its part, Delaware historically has divided the concept of assumption of the risk into two distinct doctrines -- primary assumption of the risk and secondary assumption of the risk.[24] The distinction between the doctrines, however, has not always been meaningful. Prior to 1984, Delaware applied traditional contributory negligent standards and barred a plaintiff's recovery if the defendant established any contributory negligence on the part of the plaintiff. Under these traditional notions of contributory fault, any assumption of the risk by the plaintiff would operate to bar his recovery, regardless of whether it was "primary" or "secondary."[25] As the Delaware Supreme Court observed in *Bib v. Merlonghi*,[26] "[w]e think it makes little difference in the present case whether the defense is called assumption of risk or contributory negligence or given no title at

---

23. RESTATEMENT (SECOND) OF TORTS § 496A.

24. *Croom*, 1994 WL 466013, at *5.

25. *See Koutoufaris v. Dick*, 604 A.2d 390, 397 (Del.1992).

26. 252 A.2d 548 (Del.1969).

all; this is one of those cases where the two theories overlap." [27]

■■ Delaware's passage of the comparative negligence statute in 1984 changed the legal landscape in which the doctrine of assumption of the risk resided.[28] Under the current statutory comparative negligence standards, a plaintiff cannot make out a *prima facie* case in negligence when confronted with a well-founded allegation of primary assumption of the risk. Primary assumption of the risk, therefore, remains a complete bar to a plaintiff's recovery.[29] On the other hand, secondary assumption of risk does not operate to nullify the plaintiff's negligence case, but rather operates, like comparative negligence, to reduce the plaintiff's recovery in accordance with the fact-finder's allocation of fault.[30]

■ Now that the distinction has become more meaningful, more care has been taken by the courts to articulate the parameters of the defenses. It is now settled in Delaware that primary assumption of the risk is implicated when the plaintiff expressly consents "to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone." [31] "Express consent," however, does not suggest that the plaintiff must utter specific words portraying his intent to consent to the risk.[32] Instead, "[d]epending upon the situation at hand, express consent may be manifested by circumstantial words or conduct." [33] In all, the resulting effect of a primary assumption of the risk defense "is that the defendant is relieved of legal duty to the plaintiff; and being under no legal duty, he cannot be charged with negligence." [34]

■ Secondary assumption of risk, on the other hand, is generally implicated "where the plaintiff's conduct in encountering a known risk may itself be unreasonable, because the danger is out of proportion to the advantage which he is seeking to obtain[.]" [35] The defense does not, however, relieve a defendant of legal duty to a plaintiff. The conduct of the plaintiff is instead considered a form of comparative negligence and his recovery is dependent upon the relative fault a fact-finder attributes to him. Hence the now generally accepted notion that secondary assumption

---

27. *Id.* at 550. *See also Koutoufaris*, 604 A.2d at 397.

28. *See* Del. Code Ann. tit.10, § 8132 (1999). *See also Koutoufaris*, 604 A.2d at 397 (discussing the impact of the comparative negligence statute on traditional assumption of the risk analysis).

29. *See Lafate v. New Castle County*, C.A. No. 97C–11–112, 1999 WL 1241074, at *3 (Del.Super.Ct. Oct. 22, 1999) ("Primary assumption of the risk by a plaintiff is an affirmative defense that bars a claim of negligence. It exists when a person expressly relieves the other of all legal duty.") (internal citation omitted).

30. *Croom*, 1994 WL 466013, at *5.

31. *Fell v. Zimath*, 575 A.2d 267, 267–268 (Del.Super.Ct.1989). *See also* Prosser & Keeton on Torts, § 68; 57B Am. Jur. 2D *Negligence* § 1010 (2004) ("Primary assumption of risk ... relieves the defendant of any obligation to exercise care for the injured person's protection, including situations where an injured person, having knowledge of a hazard, continued voluntarily to encounter it.").

32. *Croom*, 1994 WL 466013, at *5.

33. *Id.* *See also* 57B Am. Jur. 2D *Negligence* § 1010 ("Primary assumption of risk is akin to express *or implied consent*[.]") (emphasis added).

34. *Fell*, 575 A.2d at 267–268.

35. *Id.* at 268.

of the risk is completely subsumed by the principles of comparative negligence.[36]

## C. Primary Assumption of the Risk Does Not Apply to Healthcare

Courts have allowed a primary assumption of the risk defense to negate a wide array of negligence claims. Having said that, the defense most frequently surfaces in cases of sports-related activities that "involv[e] physical skill and challenges posing significant risk of injury to participants in such activities, and as to which the absence of such a defense would chill vigorous participation in the sporting activity and have a deleterious effect on the nature of the sport as a whole."[37] Prime examples of such activities include: (1) being a spectator at a sporting event such as a baseball or hockey game or tennis match where projectiles may be launched into the audience; (2) participating in a contact sporting event; (3) bungee jumping or bungee bouncing; (4) operating a jet-ski, or engaging in other noncompetitive water sports such as water-skiing, tubing, or white-water rafting; (5) drag racing; and (6) skydiving.[38]

Two common themes appear in each instance where primary assumption of the risk has been deemed to be an appropriate affirmative defense. First, the plaintiff chooses to engage in the activity, not out of necessity but out of a desire to satisfy a personal preference, e.g., to participate or watch others participate in a sporting event. Second, when the plaintiff chooses to engage in the inherently risky activity, he acknowledges that he and others engaging in such activity may not act with "ordinary care."[39] For instance, when the plaintiff signs up to play ice hockey in a community league, he is likely to sign a consent that advises him that there is physical contact inherent in the sport that may cause injury. If he is injured when another player checks him into the boards, he will have no claim sounding in negligence because the other player acted within the rules of the game and the plaintiff primarily assumed the risk of injury.[40] If, on the other hand, that same plaintiff is hip checked into a parked car while walking down the street, the doctrine of primary assumption of the risk does not apply because the plaintiff has not consented

36. *Croom*, 1994 WL 466013, at *5. *See also* 57B Am. Jur. 2D *Negligence* § 1010 ("Secondary assumption of risk is akin to contributory negligence[.]").

37. *Peart v. Ferro*, 119 Cal.App.4th 60, 13 Cal. Rptr.3d 885, 894 (2004).

38. *See Goodlett v. Kalishek*, 223 F.3d 32 (2d Cir.2000); *Peart v. Ferro*, 119 Cal.App.4th 60, 13 Cal.Rptr.3d 885 (2004); *Record v. Reason*, 73 Cal.App.4th 472, 86 Cal.Rptr.2d 547 (1999); *Livshitz v. U.S. Tennis Ass'n Nat'l Tennis Ctr.*, 196 Misc.2d 460, 761 N.Y.S.2d 825 (N.Y.City Civ.Ct.2003); *Cave v. Burt*, No. 03CA2730, 2004 WL 1465730, at *1 (Ohio Ct.App. June 29, 2004); *Reed v. Cassidy*, No. 2-01-36, 2002 WL 533393, at *1 (Ohio Ct. App. Apr. 10, 2002); *Tucker v. ADG, Inc.*, 102 P.3d 660 (Okla.2004); *Taylor v. Thurston County*, No. 29854-6-II, 2004 WL 1103006, at *1 (Wash.Ct.App. May 18, 2004).

39. *See* Pattern Jury Instructions for Civil Practice in the Superior Court of the State of Delaware, § 5.1 (Rev. 2003) (instruction entitled "Negligence Defined").

40. This view of primary assumption of the risk is consistent with the view that primary assumption of the risk is subsumed within the duty analysis. In the hockey example, the plaintiff has no claim of negligence against the other player because, in the midst of the hockey game, the other player was under no legal duty to refrain from checking the plaintiff into the boards. Whether the argument is couched as a duty argument or a primary assumption of the risk defense, the result is the same; the claim is barred as a matter of law.

to engage in such conduct or to have others engage in such conduct towards him.

■ Of the two themes prevalent in primary assumption of the risk scenarios, the first is rarely extant in the healthcare context and the second never is in play and could not be countenanced in any event. As to the first theme, it is rare that a consumer of healthcare services chooses to be sick or otherwise in need of care. Most people, with the exception of those who have elective or cosmetic surgery, seek out health care because they must. In this case, for example, Mr. Storm went to Rockland for healthcare services because he suffered from, among other conditions, multiple sclerosis and an alcohol addiction that required specialized care. One can safely say that he did not choose to suffer from those conditions and did not choose to be in need of care for them. The element of choice is missing.

As to the second theme, there is virtually no scenario in which a patient can consent to allow a healthcare provider to exercise less than "ordinary care" in the provision of services.[41] Even if given, a patient's consent to allow a healthcare provider to exercise less than ordinary care would be specious when considered against the strict legal, ethical and professional standards that regulate the healthcare profession. Regardless of whether the patient elects to have healthcare or requires it, the patient appropriately expects that the treatment will be rendered in accordance with the applicable standard of care. This is so regardless of how risky or dangerous the procedure or treatment modality might be.

Rockland's attempt to invoke the primary assumption of the risk defense fails because it cannot demonstrate that Mr. Storm chose to be sick or that he consented to allow Rockland to exercise less than ordinary care when it provided healthcare services to him. Even assuming *arguendo* that Mr. Storm was aware of the risks associated with independent living, he accepted these risks only because he was in need of medical care. Moreover, by accepting the risks inherent in the Rockland treatment environment, he did not in any way consent to allow Rockland to exercise less than what the applicable standards of care required of it when providing services. Permitting a primary assumption of the risk defense under these circumstances would simply be unconscionable.[42]

■ Courts in other jurisdictions have likewise concluded that primary assumption of the risk does not fit in the healthcare context.[43] These courts have noted "that the disparity in knowledge between professionals and their clientele generally

---

**41.** The only such scenario that the Court can envision is where the patient gives informed consent to undergo an experimental medical procedure where the standards of care have not yet been fully developed or consents to treatment modalities known to be outside of the medical mainstream. *See e.g. Boyle v. Revici,* 961 F.2d 1060 (2d Cir.1992) and *Schneider v. Revici,* 817 F.2d 987 (2d Cir. 1987) (holding that a jury charge on primary assumption of the risk was proper in medical malpractice case *only* where a patient knowingly passed on conventional medical treatment to undergo medical treatment that did not conform to accepted medical standards,

such as ingesting non-FDA approved medication).

**42.** *See Tucker v. Albun, Inc.,* C.A. No. 97C–04–025, 1999 WL 1241073, at *2, *5 (Del.Super.Ct. Sept. 27, 1999) (Holding that a release from liability is unconscionable, and thus invalid, if there was an absence of meaningful choice.); *Hallman v. Dover Downs, Inc.,* C.A. No. 85–618, 1986 WL 535, at *3 (D.Del. Dec. 31, 1986) ("To find unconscionability, there must be an absence of meaningful choice[.]").

**43.** *See Morrison v. MacNamara,* 407 A.2d 555, 567 (D.C.1979) (citing other authorities).

precludes recipients of professional services from knowing whether a professional's conduct is in fact negligent." [44] Particular to medical negligence cases, "the superior knowledge of the [healthcare provider] with [its] expertise in medical matters and the generally limited ability of the patient to ascertain the existence of certain risks and dangers that inhere in certain medical treatments, negates the critical elements of the defense, i.e., knowledge and appreciation of the risk." [45] It is not surprising, then, that neither the Court nor Rockland has located a single case that would support the application of a primary assumption of the risk defense in a healthcare context.[46]

There is another reason to find that primary assumption of the risk does not apply here over and above the fact that the key components of the defense are missing. Barring recovery to a patient who has received negligent health care would not comport with Delaware's medical negligence statutes and the various regulations governing Delaware healthcare providers.[47] For its part, the Act provides a patient with a statutory right to recover damages against healthcare providers for medical negligence. Specifically, Del. Code Ann. tit. 18, § 6801(7) provides:

"Medical negligence" means any tort or breach of contract based on healthcare or professional services rendered, or which should have been rendered, by a healthcare provider to a patient. The standard of skill and care required of every healthcare provider in rendering professional services or healthcare to a patient shall be that degree of skill and care ordinarily employed in the same or similar field of medicine as defendant, and the use of reasonable care and diligence.

While the standard of skill and care may vary from case-to-case, and healthcare provider-to-healthcare provider, the General Assembly has given no indication in the Act that a healthcare provider is ever free from its duty to provide the standard of care to its patients under any circumstances, even when the patient purportedly acknowledges the risk of injury.[48] The Regulations, likewise, are devoid of provisions that would permit a healthcare provider to avoid liability by claiming that the patient primarily assumed the risk of injury. To the contrary, 40–700–047 Del. Code Regs. § 63.611 specifically prohibits an assisted living facility from entering into an agreement which seeks "to avoid liability for harm caused to a resident by the negligence of the assisted living agen-

---

44. *Id.*

45. *Id.* See also *Darling v. Fairfield Med. Ctr.,* 142 Ohio App.3d 682, 756 N.E.2d 754 (2001) (primary assumption of the risk does not apply to medical negligence claim); *Conrad–Hutsell v. Colturi,* No. L–01–1227, 2002 WL 1290844, at *1 (Ohio Ct.App. May 24, 2002) (same); *Hardi v. Mezzanotte,* 818 A.2d 974, 980 (D.C.2003) (same).

46. Rockland cites to *Boyle,* 961 F.2d 1060 and *Schneider,* 817 F.2d 987. As indicated already, these cases are distinguishable because both involve patients who knowingly sought out medical treatment that did not conform to accepted medical standards, such

as ingesting non-FDA approved medication. Here, Rockland has not asserted that Mr. Storm knowingly elected to forego conventional medical treatment in favor of treatment that did not conform to accepted medical standards.

47. See Del. Code Ann. tit. 18, §§ 6801–6865; 40–700–047 Del. Code Regs. §§ 63.0–63.12.

48. *Cf.* Del. Code Ann. tit. 18, § 6852 (explaining the requirement that the healthcare provider obtain the patient's informed consent to perform healthcare services, but in no way suggesting that doing so will relieve the healthcare provider of his duty to comply with the standard of care).

cy[.]" The statutes and regulations that govern the healthcare industry in Delaware reflect a public policy that patients who are injured by negligent healthcare should be entitled to seek compensation for their injuries. This public policy would be offended if healthcare providers could seek to avoid liability altogether by alleging that the patient primarily assumed the risk of injury.

In addition to the public policy embodied in Delaware's statutory and regulatory healthcare schemes, the Court also is guided by the public policy considerations that have directed other courts to strike down exculpatory agreements between healthcare providers and patients, even in the absence of controlling statutes. This guidance is appropriate given that a primary assumption of the risk defense and an exculpatory agreement both lead to the same result: the healthcare provider is relieved of liability. The public policy implications of exculpatory agreements in the healthcare context were thoroughly considered in the seminal case *Tunkl v. Regents of the Univ. of Cal,*[49] where the court considered several factors to determine whether an exculpatory provision should be enforced: (1) whether the defendant's business is of a type generally thought suitable for public regulation; (2) whether the defendant is engaged in performing a service of great importance to the public, which is often a matter of necessity for some members of the public; and (3) whether the defendant holds itself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.[50] According to *Tunkl,* if the facts point to affirmative answers to these queries, public policy will not permit an exculpatory clause to govern the relationship between the provider and consumer of services under such circumstances.

Applied here, the *Tunkl* factors clearly direct a finding that public policy cannot permit Rockland to assert a primary assumption of the risk defense. Assisted living facilities such as Rockland are regulated by the state under DEL. CODE ANN. tit. 16, §§ 1101–1169 and 40–700–047 DEL. CODE REGS. §§ 63.0–63.12. They must be licensed and conform to the many standards and requirements established by this statutory and regulatory scheme. One such requirement is to ensure that residents of the assisted living facility have "the right to receive appropriate care, treatment and services[.]"[51] Clearly, assisted living facilities are engaged in performing a service "of great importance to the public" as recognized by 40–700–047 DEL. CODE REGS. § 63.0, which provides: "Assisted Living is a major component of a comprehensive community-based residential long term care continuum that provides the necessary level of services to dependent elderly or persons with disabilities in the appropriate environment." Further, Rockland "holds itself out to the public as willing to perform this service" for persons who are disabled and meet the criteria of admission. Therefore, the *Tunkl* factors are satisfied and public poli-

**49.** 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (1963). *See also Wagenblast v. Odessa Sch. Dist.,* 110 Wash.2d 845, 758 P.2d 968 (1988); *Eelbode v. Chec Med. Ctrs. Inc.,* 97 Wash.App. 462, 984 P.2d 436 (Wash.Ct.App. 1999).

**50.** The remaining three factors all concern the bargaining power of the parties in forming the resulting exculpatory contract and therefore are not applicable in assessing whether a primary assumption of the risk defense violates public policy.

**51.** DEL. CODE ANN. tit. 16, § 1121.

cy dictates that Rockland not escape liability if it engaged in culpable conduct.

### D. Plaintiff's Secondary Assumption of the Risk

■ Although primary assumption of the risk is not available to Rockland under the circumstances presented here, Rockland will be permitted to prosecute its affirmative defense of secondary assumption of the risk and to elicit evidence at trial that Mr. Storm's conduct contributed to his injuries.[52] The issue of whether that conduct constitutes contributory negligence and, if so, the degree of fault that should be attributed to Mr. Storm, remain questions of fact for the jury to decide.[53] These questions will be considered within the parameters established by Delaware's statutory comparative negligence scheme. Presumably, they will also be considered as questions secondary to Rockland's showcase defense, namely, that the Storms cannot establish that Rockland breached the standard of care in the provision of services to Mr. Storm. This threshold issue remains very much in dispute.

### VI.

Based on the foregoing, the Court is satisfied that Rockland's legal status as a licensed assisted living facility and healthcare provider do not allow it to assert a primary assumption of the risk defense as a means to escape liability for allegedly substandard health care. Rockland's motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

---

**52.** *See* DEL. CODE ANN. tit. 10 § 8132. *See also Colturi,* 2002 WL 1290844, at * 5 (permitting implied, or secondary assumption of the risk in a healthcare context.).

**53.** *See Cook v. E.I. DuPont de Nemours and Co.,* C.A. No. 99C–01–023, 2001 WL 1482685, at *5 (Del.Super.Ct. Aug. 20, 2001).