

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | |
|---|---|
| JOSEPHINE WILSON, | ) |
| | ) |
| Appellant, | ) |
| | ) WD78538 |
| v. | ) |
| | ) OPINION FILED: |
| | ) June 21, 2016 |
| P.B. PATEL, M.D., P.C., and | ) |
| ROHTASHAV DHIR, M.D., | ) |
| | ) |
| Respondents. | ) |

**Appeal from the Circuit Court of Buchanan County, Missouri**
**The Honorable Weldon C. Judah, Judge**

**Before Division IV:** Alok Ahuja, Chief Judge, Presiding,
Mark D. Pfeiffer, Judge, and J. Dale Youngs, Special Judge

Ms. Josephine Wilson ("Wilson") appeals the judgment, following a jury trial, of the Circuit Court of Buchanan County, Missouri ("trial court"), in favor of defendants P.B. Patel, M.D., P.C., and Rohtashav Dhir, M.D. (collectively, "Dhir"), on Wilson's medical malpractice claim. On appeal, Wilson claims instructional, evidentiary, jury venire, and closing argument errors by the trial court. We affirm.

**Factual and Procedural Background**

Wilson had a history of acid reflux and trouble swallowing; she had been treated for these conditions since about 2000. She underwent balloon dilation of her esophagus for her reflux in 2004 and again in 2005, which provided some long-term relief.

In the fall of 2009, Wilson saw Dr. Scott Knappenberger, an ear, nose, and throat specialist. Dr. Knappenberger diagnosed chronic pharyngitis (inflammation of the throat lining), and globus sensation (subjective feeling of something stuck in the throat, resulting in difficulty swallowing, but without physical findings to suggest an abnormality). He referred her to Dhir, a gastroenterologist, for consultation and evaluation.

Dhir saw Wilson in his office on December 2, 2009, and prescribed Kapidex, a medication for her reflux. He scheduled an appointment for Wilson to undergo an esophagogastroduodenoscopy ("endoscopy") on December 8, 2009, at an outpatient clinic. His notes from the December 2 appointment state, "An [endoscopy] will be performed. The procedure was discussed with the patient today. The patient voices understanding. She might need dilation of the esophagus depending on the findings." Wilson understood after this visit that Dhir "was going to go in and do a scope like Dr. McCormick had done" in 2004 and 2005 and that "if there was any problem, that he would fix it like Dr. McCormick had done in the past."

On December 8, 2009, Dhir performed the endoscopy, through which Dhir was able to visualize Wilson's esophagus and stomach down to her duodenum. The endoscope revealed "nothing in the duodenum that would stimulate any further action on my part or important to be noted." Dhir found gastritis in her stomach and a single polyp near the top of Wilson's

esophagus, which he removed with forceps. Dhir's operative report stated that Wilson's "GE junction [where the stomach meets the esophagus] and the esophagus seem to be normal."

Despite the normal findings of the endoscopy, Dhir decided to perform an esophageal dilation procedure, or a stretching of Wilson's esophagus, using a large, rubbery bore dilator. As the dilator was manually pushed down the esophagus, Dhir felt for resistance of the dilator going through a narrowing. Dhir testified that the "dilation went smooth," and he felt nothing other than an expected mild resistance.

Upon withdrawal of the dilator, Dhir observed that the guidewire was kinked. Dhir performed another endoscopy and observed a tear in the esophageal lining that he concluded had been caused by the dilation. One of the risks of dilation is tearing or perforating the esophagus.

Dr. Robert Zink, a cardiothoracic surgeon, repaired the esophageal tear. The repair required Dr. Zink to open Wilson's chest wall, spread her ribs, and collapse one of her lungs to reach the esophagus. During the repair, Dr. Zink observed no esophageal abnormalities other than the tear. He noticed no fibrous tissues or otherwise abnormal tissues. Following the repair, Wilson has experienced pain in her chest "all the time. It's not just the ribs. It's the nerves. It's the muscles . . . ." Her pain feels like "a huge knife that's on fire and it's just stabbing me and it just burns."

Wilson's argument of malpractice was that the esophageal dilation was medically unnecessary and below the standard of care because she had a normal esophagus without signs or findings of a stricture or other abnormality, and there was no reason to stretch it. Wilson's expert, Dr. Richard Dwoskin ("Dwoskin"), testified that the established and relevant standard of care at the time of the procedure was, "Don't dilate unless you see a structural abnormality." Dwoskin opined that Wilson's difficulty swallowing, or dysphagia, was caused by her reflux and

3

that it could have been treated with the Kapidex medication alone. Dwoskin, who relied upon guidelines issued from the American Society for Gastrointestinal Endoscopy ("ASGE"), testified that empiric dilation (dilation without findings of stricture or abnormality) fell out of favor no later than 2006 because medical research failed to establish any benefit to dysphagia patients that outweighed the risk of esophageal perforation, and medication was effective and less risky. Dwoskin opined that Dhir should have continued treating Wilson with medication, set a follow-up appointment, and re-evaluated her progress at that time.

Dhir contended that he exercised sound professional judgment in deciding to perform the dilation, despite the normal endoscopy findings, because he thought it would help her with her dysphagia, and because sometimes abnormal esophageal tissues occurred in outer layers of the esophagus that were not visible with endoscopy. Dhir also had an expert, Dr. Ginsburg, testify on his behalf. Dr. Ginsburg opined that the ASGE guidelines that counseled against empiric dilation did not apply in every case and that sometimes empiric dilation was appropriate, as it was in Wilson's case. Dr. Ginsburg opined that his conclusion was supported by the fact that Wilson had a history of esophageal strictures, dysphasia, and the absence of a condition called eosinophilic esophagitis. Dr. Ginsburg opined that Dhir had employed the appropriate standard of care in treating Wilson.

At trial, Wilson did not present a claim for failure to provide informed consent. Her only theory at trial was that Dhir was negligent in performing the dilation absent abnormal findings during the endoscopy. Nonetheless, Dhir's counsel mentioned during opening statement that Wilson signed an "informed consent" that stated that the risks and benefits of the endoscopy had been explained to her and "that my doctor may choose to do other procedures if necessary." Wilson's counsel did not object to the mention of the "informed consent" in opening statements.

4

Dhir's counsel also cross-examined Wilson about the "informed consent." Again, Wilson's counsel did not object but on redirect used the informed consent documentation to question Wilson about whether the form was just one of many forms that she was asked to sign immediately before the endoscopy, forms that Wilson claimed she had not had the time to read closely before signing them.

Dhir's counsel later asked Dhir on his direct examination whether his patients are asked to sign an "informed consent" document. At this point, Wilson's counsel finally objected to the "informed consent" line of questioning on the basis of relevancy. This objection was overruled, and Wilson does not challenge that ruling on appeal. At several later points during the testimony, esophageal perforation was described as a "known complication" of esophageal dilation. After the close of the evidence, Wilson's counsel requested a withdrawal instruction to remove "informed consent to the esophageal dilation" from the jury's consideration, as Wilson had not pleaded an "informed consent" claim in her lawsuit nor had any plans to submit such a claim to the jury. The trial court refused the instruction.

In closing arguments, Dhir's counsel argued that Wilson "was aware and agreed that there was a possibility that Dr. Dhir might do a dilation upon her" and that Wilson suffered a "known complication" of the dilation. Wilson's counsel did not object to this argument.

During deliberations, the jury[1] asked to see "a copy of the consent form that Ms. Wilson signed before the procedure with Dr. Dhir." It was given to them. Ultimately, the jury returned with a verdict for the defense. This appeal follows.

---

[1] Wilson challenged two jury venirepersons for cause, but her motions to strike both of these venirepersons were overruled by the trial court. Wilson appeals the denial of her motions to strike as her Points VI and VII in this appeal. Additional relevant facts relating to these points are set forth in the section discussing our ruling on them.

**Standard of Review**

All of the issues on appeal are generally governed by the abuse of discretion standard. *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 129-30 (Mo. banc 2007) (withdrawal instructions); *Gleason v. Bendix Commercial Vehicle Sys., L.L.C.*, 452 S.W.3d 158, 178 (Mo. App. W.D. 2014) (closing arguments); *Peterson v. Progressive Contractors, Inc.*, 399 S.W.3d 850, 869 (Mo. App. W.D. 2013) (admission of evidence); *Joy v. Morrison*, 254 S.W.3d 885, 888 (Mo. banc 2008) (strikes for cause). A trial court abuses its discretion when its ruling "is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Brizendine v. Bartlett Grain Co.*, 477 S.W.3d 710, 714 (Mo. App. W.D. 2015) (internal quotation omitted).

**Informed Consent**

Wilson's first two points on appeal argue error with the trial court's handling of the "informed consent" issue and will thus be discussed together.

Of note, Wilson does not deny that she did not object to Dhir's counsel's discussion of the informed consent documentation in Dhir's opening statement. Wilson does not deny that *both* parties injected testimony about the informed consent documentation without objection during the trial. Wilson does not even challenge the trial court's subsequent ruling during trial overruling her relevancy objection to Dhir's testimony about the "informed consent" documentation. Rather, Wilson claims, in her first point on appeal, that the trial court abused its discretion in refusing to submit to the jury her withdrawal instruction[2] regarding informed

---

[2] The trial court possesses discretion to submit withdrawal instructions "when evidence on an issue has been received, but there is inadequate proof for submission of the issue to the jury; when there is evidence presented which might mislead the jury in its consideration of the case as pleaded and submitted; when there is evidence presented directed to an issue that is abandoned; or when there is evidence of such character that might easily raise a false issue." *Brizendine v. Bartlett Grain Co.*, 477 S.W.3d 710, 715 (Mo. App. W.D. 2015) (internal quotation omitted).

6

consent and, in her second point on appeal, that the trial court abused its discretion in permitting "informed consent" argument by Dhir's counsel in closing argument.

The relevancy of "informed consent" evidence in a case where lack of consent has not been pled or submitted to a jury by the plaintiff at trial has not previously been discussed by Missouri courts. Wilson cites to numerous cases from other jurisdictions in her brief. While Dhir correctly points out that none of these cases is binding on this court, many of the cases decided in other jurisdictions were also issues of first impression, and they themselves looked to other states for guidance. They also are essentially unanimous in their conclusions that evidence of informed consent is irrelevant as to whether a physician has committed medical negligence. *See, e.g., Matranga v. Parish Anesthesia of Jefferson, LLC*, 170 So.3d 1077 (La. Ct. App. 2015); *Brady v. Urbas*, 111 A.3d 1155 (Pa. 2015); *Fiorucci v. Chinn*, 764 S.E.2d 85 (Va. 2014); *Baird v. Owczarek*, 93 A.3d 1222 (Del. 2014); *Warren v. Imperia*, 287 P.3d 1128 (Or. Ct. App. 2012); *Schwartz v. Johnson*, 49 A.3d 359 (Md. Ct. Spec. App. 2012); *Hayes v. Camel*, 927 A.2d 880 (Conn. 2007); *Wright v. Kaye*, 593 S.E.2d 307 (Va. 2004).

The *Schwartz* case from Maryland is perhaps the most *factually* similar. In that case, although the patient plaintiff had signed a pre-procedure consent document acknowledging the risks and complications of the procedure (in that case, a colonoscopy), and the patient ultimately suffered one of the known complications relating to that procedure, the court found all evidence of the informed consent to be irrelevant because the plaintiff was not claiming that the physician had failed to obtain his informed consent to perform the colonoscopy procedure but that the physician had performed the colonoscopy procedure negligently. *Schwartz*, 49 A.3d at 365-66. The *Schwartz* court examined cases from other jurisdictions and noted that, unless a patient refuses treatment recommended by her doctor or elects to follow an unconventional medical

7

treatment, it cannot be said that a patient "assume[s] the risk" of medical negligence merely by receiving and signing an informed consent. *Id.* at 371. The court found that to conclude otherwise would mean that the informed consent would, in effect, mean that the physician "owed no duty" to his patient. *Id.* at 372 (internal quotation omitted). Quoting a Delaware case, *Storm v. NSL Rockland Place, LLC*, 898 A.2d 874, 880 (Del. Super. Ct. 2005), the *Schwartz* court stated, "Regardless of whether the patient elects to have healthcare or requires it, the patient appropriately expects that the treatment will be rendered in accordance with the applicable standard of care. This is so regardless of how risky or dangerous the procedure or treatment modality might be." *Id.*

The *Schwartz* court also pointed out the disparity in knowledge between doctors and their patients, which often precludes patients from even knowing whether their doctors' conduct was negligent. *Id.* When the physician does not admit negligence, as in *Schwartz* and as in this case, the only risk a patient assumes by signing an informed consent is the risk of a *non-negligent* complication, and the assumption of this risk can be raised "only as a defense to a claim of a breach of informed consent, which claim was not brought by [the patient] in the instant case." *Id.* at 373. The court noted, as Missouri courts have found, that breach of informed consent and negligent medical malpractice claims are "*separate, disparate theories* of liability." *Id.* (internal quotation omitted). It concluded that any evidence of the informed consent would be irrelevant and would be prejudicial to the plaintiff. *Id.* at 374. Such evidence "could only serve to confuse the jury because the jury could conclude, contrary to the law and the evidence, that consent to the surgery was tantamount to consent to the injury which resulted from that surgery. In effect, the jury could conclude that consent amounted to a waiver, which is plainly wrong." *Wright v. Kaye*, 593 S.E.2d 307, 317 (Va. 2004).

8

Evidence of informed consent has not only been found to be irrelevant and prejudicial in cases where negligent performance of a procedure are alleged but also when negligent misdiagnosis has caused a physician to perform a procedure that was unnecessary. *Fiorucci v. Chinn*, 764 S.E.2d 85, 87 (Va. 2014).

That said, the *procedural* posture of this line of cases relate to objections as to the *admissibility* of "informed consent" evidence, not a challenge to the wide discretion possessed by a trial court in refusing to *withdraw* evidence (via a withdrawal instruction) that has already been admitted at trial. It is in this regard that Wilson's present case differs significantly from all of the precedent Wilson has cited in support of her appeal.

In the present case, no motion *in limine* regarding the "informed consent" document or Wilson's discussion of possible risks with Dhir or his staff was filed. When Dhir's counsel mentioned informed consent in opening statements, Wilson did not object. When Wilson was asked about the informed consent documentation during her cross-examination, her counsel did not object but rather attempted to discount the effect of the document in redirect by counting it as one of many documents that were hurriedly presented to Wilson immediately prior to her surgery, which gave her little or no opportunity to read the documentation in a meaningful manner. No objection to the topic of informed consent was made until Dhir was examined by his counsel in his case-in-chief. Thus, Wilson's "counter-attack" of the informed consent documentation and her counsel's delay in objecting to the evidence regarding informed consent resembles a trial strategy gone awry, not reversible error by the trial court.

Even now, Wilson does not claim in her points relied on that the trial court erred in overruling her objection to the relevance of this evidence. Wilson only claims error in the trial court's refusal to grant a withdrawal instruction. And while we likely would not have found an

abuse of discretion had the trial court accepted the offered withdrawal instruction and read it to the jury, we cannot conclude that the trial court abused its broad discretion in refusing the withdrawal instruction, considering how much discussion of the evidence had already been introduced by *both* parties prior to the request for a withdrawal instruction.[3] A trial court is in the best position to determine whether the jury would be confused by a withdrawal instruction, and often, "the better practice is to tell the jury what the issues are rather than to tell them what issues are not." *Nelson v. O'Leary*, 291 S.W.2d 142, 148 (Mo. 1956).

Similarly, where both parties had introduced evidence on the topic of informed consent and Wilson did *not* object to Dhir's counsel's argument related to that evidence, we refuse to convict the trial court of error for failing to *sua sponte* prohibit Dhir's counsel's closing argument commentary on the informed consent topic.

Though Wilson cites to *Gleason v. Bendix Commercial Vehicle Systems, L.L.C.*, 452 S.W.3d 158, 178-79 (Mo. App. W.D. 2014), for the proposition that the trial court has discretion to control closing arguments, the appellant in *Gleason* had objected to the closing argument at trial. Wilson's failure to object means that her second point on appeal is reviewed only for plain error. *State v. Powell*, 286 S.W.3d 843, 852 (Mo. App. W.D. 2009). Rarely is a trial court's failure to *sua sponte* interrupt a closing argument plain error. *Id.* Furthermore, "the permissible field of argument is broad, and so long as counsel does not go beyond the evidence and the issues drawn by the instructions . . . [counsel] is permitted wide latitude in his comments." *Heshion Motors, Inc. v. Western Int'l Hotels*, 600 S.W.2d 526, 534 (Mo. App. W.D. 1980).

---

[3] Wilson's reliance upon *Womack v. Crescent Metal Products, Inc.*, 593 S.W.2d 481 (Mo. App. 1976), and *Sampson v. Missouri Pacific Railroad Co.*, 560 S.W.2d 573 (Mo. banc 1978), is misplaced. The party seeking the withdrawal instruction in those cases introduced the objectionable evidence through inadvertence (*Womack*) or out of a necessity to prove a different issue critical to the case (*Sampson*). *Womack*, 539 S.W.2d at 485; *Sampson*, 560 S.W.2d at 584. Here, there was nothing inadvertent or necessary about Wilson's counsel's decision to attempt to explain away the significance of the informed consent documentation in the redirect testimony of Wilson. Further, the evidence had already been mentioned in opening statement and was the topic of lengthy witness examination previously in the case, both without objection. Thus, *Womack* and *Sampson* are inapposite to the present case.

Here, the closing argument complained of was confined to evidence that had been introduced at trial without objection.

Points I and II are denied.

**Eosinophilic Esophagitis**

Wilson's next three points on appeal relate to evidence about a medical condition called Eosinophilic Esophagitis ("EoE"). Because the points are interrelated, we address them together.

EoE is a condition wherein a person experiences an allergic reaction to food. It can cause inflammation of the esophagus and could possibly explain a patient's difficulty swallowing. It is accepted medical practice that esophageal dilation of EoE patients is contraindicated because patients with EoE are much more prone to esophageal laceration or perforation. As mentioned earlier, Wilson's expert, Dr. Dwoskin, testified that empiric esophageal dilation is not recommended in the medical community post-2006 due to its limited effectiveness relative to its risk of complications like esophageal perforation. During cross-examination of Dwoskin, Dhir's counsel asked Dwoskin whether he agreed with a 2005 medical article that stated: "In the patient with a normal-appearing esophagus without evidence of [EoE], the American Gastroenterology Association practice guidelines suggest empiric dilation of the esophagus." Dwoskin disagreed and noted that was not the standard in 2006 or afterward.

Dhir's expert witness, Dr. Ginsburg, testified that empiric dilation was only *not* recommended post-2006 because at that time it was difficult to recognize EoE. However, it had already been determined by 2005 that Wilson did not have EoE. Therefore, Dr. Ginsburg opined that any increased risk that might affect the recommendation of the guidelines generally would not have pertained to Wilson. On cross-examination, Wilson's counsel quoted to Ginsburg a passage from the 2006 guidelines of the ASGE that reads:

11

> Although some endoscopists suggest that large-bore dilators be passed empirically if the endoscopy has normal results, results from two of three studies have shown that empiric dilation does not improve dysphagia scores. Thus, because of the potential risk of perforation with use of large-bore dilators, particularly in patients with unrecognized eosinophilic esophagitis, empiric dilation cannot be routinely recommended if no structural abnormalities are seen at endoscope.

Wilson's counsel asked Ginsburg whether he agreed with it, and he answered equivocally. Ginsburg testified essentially that although many empiric esophageal dilations performed in the referenced studies were not effective at relieving the patients' symptoms, "[t]here were definitely people in the articles that got a response." He also testified that a physician may not choose to empirically dilate some patients, due to their individual circumstances or due to unknowns, but might choose to empirically dilate a patient who has "had a known esophageal stricture" or has "had a known recurrence of the esophageal stricture and is now again having trouble swallowing, then I don't know that that—that those group studies apply to an individual patient."

After Wilson's cross-examination, and over Wilson's objection, Dhir's counsel was allowed to redirect using a different portion of the ASGE guidelines which did not state that empiric dilation was contraindicated.

Wilson's third point on appeal argues that the trial court abused its discretion in refusing another offered withdrawal instruction in which the subject matter related to instructing the jury that the medical condition of EoE and any discussion of it were withdrawn from the case. And, in the fourth and fifth points on appeal, Wilson argues that the trial court erred in permitting Dr. Ginsburg, in his redirect testimony, to "comment on the summary portion [of the ASGE guidelines] transform[ing] his testimony into 'evidence.'"

While we agree that treatises and authoritative texts are hearsay and generally not admissible as substantive evidence, *Kelly v. St. Luke's Hosp. of Kansas City*, 826 S.W.2d 391,

396 (Mo. App. W.D. 1992), Wilson's arguments are hardly convincing when it was *Wilson* who initiated reading from the ASGE guidelines in the first instance—during cross-examination of Dr. Ginsburg. Thus, had it not been for *Wilson's* quotation from the ASGE guidelines—which included a discussion of EoE—there would have been no necessity to explain the context of the guideline statement relating to EoE via further testimony from Dr. Ginsburg about the ASGE guidelines. The purpose of Dr. Ginsburg's reference to another section from the same authoritative text was for the purpose of bringing context to the isolated excerpt that Wilson's counsel had referenced in earlier questioning.

As the trial court noted below, it would be unfair to allow Wilson's counsel to pull one statement out of a document, ask Ginsburg whether he agreed with it, but then not allow Dhir's counsel to qualify his response, pointing out that the recommendation of the guidelines was "because of" a potential risk caused by a particular condition that everyone knew that Wilson did not have. *See Stewart v. Sioux City & New Orleans Barge Lines, Inc.*, 431 S.W.2d 205, 211-12 (Mo. 1968) (rule of completeness allows other relevant parts of a statement or writing so that the part previously offered is not taken out of context).

The trial court did not abuse its discretion in permitting Dr. Ginsburg's redirect testimony concerning the ASGE guidelines relating to the significance of an EoE diagnosis, or lack thereof, where it was Wilson, not Dhir, that had introduced the relevance of the topic of EoE in the first instance. Likewise, it was not an abuse of discretion for the trial court to refuse Wilson's proffered withdrawal instruction on the topic.

Points III, IV, and V are denied.

## Juror Strikes for Cause

Wilson's sixth and seventh points on appeal are that the trial court abused its discretion in denying her motions to strike, for cause, two venirepersons (venireperson A and B)[4] during jury selection.

A party has a right to have twelve fair and impartial jurors decide her case. *Fleshner v. Pepose Vision Institute, P.C.*, 304 S.W.3d 81, 87 (Mo. banc 2010). "Each juror must enter the jury box disinterested and with an open mind, free from bias or prejudice." *Id.* (internal quotation omitted). But, the impartiality of jury venirepersons is not to be judged in a vacuum and, instead, must be judged in the context of the entirety of each venireperson's responses to voir dire questioning. "[M]ere equivocation is not enough to disqualify a juror." *Joy v. Morrison*, 254 S.W.3d 885, 890 (Mo. banc 2008). If the juror later offers "unequivocal assurances of impartiality," he should be considered rehabilitated and should not be disqualified from the panel. *State v. Grondman*, 190 S.W.3d 496, 498 (Mo. App. W.D. 2006). Here, that is precisely what happened.

Venireperson A initially responded to voir dire questioning with equivocal responses about his impartiality, admitting that he sometimes believed that personal injury lawsuits created a "circus" atmosphere of people "trying to get an extra piece of the pie." However, he later stated that he would be "neutral," and he unequivocally stated that he "could be fair and listen to the evidence and follow the instructions" and that he would "make a decision based upon the evidence." Given these "unequivocal assurances of impartiality" and the ability of the trial court to personally observe the credibility of venireperson A when the statements were made, we

---

[4] In order to protect the identities of these venirepersons who fulfilled their jury service obligation to the State but may not wish to have their identities published in the Southwestern Reporters, we will refer to the subject of Point VI as venireperson A and Point VII as venireperson B.

14

cannot conclude that the trial court abused his discretion in denying the motion to strike venireperson A for cause.

Similarly, venireperson B initially indicated a belief that there were too many lawsuits filed, particularly against physicians. But, he later stated that he would listen to the evidence presented and make a decision based upon that evidence. Specifically, the following colloquy took place between Dhir's counsel and venireperson B:

> Defense Counsel: But as you sit here, Mr. [venireperson B], and you've listened to all the voir dire and you have heard what we're really just trying do, we know that everyone has things that have happened in their past. We have family members that have done things we may like or not like, but do you think you could be fair and impartial and listen to the evidence and be a juror that would be fair to Ms. Wilson and Dr. Dhir?
>
> Venire[person B]: Yes.

Given this unequivocal response that the trial court was able to observe to judge the credibility thereof, we again cannot conclude that the trial court abused its discretion in denying the motion to strike venireperson B for cause.

Points VI and VII are denied.

## Conclusion

For all of the above-stated reasons, the judgment of the trial court is affirmed.

_____
Mark D. Pfeiffer, Judge

Alok Ahuja, Chief Judge, and J. Dale Youngs, Special Judge, concur.

15