

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| CARLA GLEASON, ET AL., | ) |
| | ) |
| Appellants, | ) WD76704 Consolidated with |
| | ) WD76706 and WD76707 |
| v. | ) |
| | ) OPINION FILED: October 28, 2014 |
| BENDIX COMMERCIAL VEHICLE | ) |
| SYSTEMS, LLC, ET AL., | ) |
| | ) |
| Respondents. | ) |

**Appeal from the Circuit Court of Clay County, Missouri**
The Honorable David P. Chamberlain, Judge

Before Division Three:  Gary D. Witt, Presiding Judge, Alok Ahuja, Chief Judge, and
Joseph M. Ellis, Judge

On May 9, 2005, a school bus operated by a driver for the Liberty Public School District crashed into a pick-up truck, instantly killing the driver of the pick-up truck, David Gleason ("Gleason"), and causing permanent, catastrophic injury to two children who were passengers on the bus, Renna Yi ("Yi") and Andrew Hubbard ("Hubbard"). The families of these victims (collectively, the "Appellants") filed a products liability action and proceeded to trial against Bendix Commercial Vehicle Systems, the manufacturer of the air brake system used on the bus, and against Thomas Built Buses,

the manufacturer of the bus (collectively, the "defendants" or "Respondents").  Following a six-week trial in the Circuit Court of Clay County, a jury returned a verdict in favor of the Respondents.  Appellants timely appealed, alleging five points of error.  We affirm.

**FACTS AND PROCEDURAL HISTORY**[1]

On May 9, 2005, Irma Thomas ("Thomas") was driving a school bus for the Liberty Public School District.  Thomas had seven years of experience driving a school bus and was on her normal route with children on board.  After Thomas crested a hill along Highway 291 in the city of Liberty, she applied the brakes to slow the bus as it descended the hill towards a busy intersection.  Thomas testified that as she pressed the brake, the bus actually accelerated.  The harder she pressed, the faster the bus seemed to go.  Witnesses testified that the bus appeared to be speeding up as it approached the intersection.  Thomas kept pressing the brake to no avail so she began swerving and maneuvering around vehicles to avoid colliding with them.  Although she avoided a number of cars in one area, she struck a pick-up truck that was stopped at the intersection of Highway 291 and Highway 152.  The driver of the pick-up truck, Gleason, a local attorney, was killed instantly.  Two of the children on board the bus were severely injured: Yi, a fourth grader, was rendered a quadriplegic after suffering a broken neck, and Hubbard, a kindergartner, was left permanently brain-damaged after suffering an open-skull fracture.  Additional children were injured, but they are not parties to this

---

[1]"In reviewing a circuit court's ruling resulting in either the grant or denial of a new trial, appellate courts view the evidence in the light most favorable to the circuit court's order." *March v. Midwest St. Louis, L.L.C.*, 417 S.W.3d 248, 253 (Mo. banc 2014) (citation omitted).

matter. The bus was estimated to be traveling at a speed between 58 and 68 miles per hour at the point of impact.

Appellants Gleason, Yi and Hubbard each filed suit, and those cases were joined for trial. The cause proceeded to trial against Bendix Commercial Vehicle Systems, the manufacturer of the air brake system used on the bus, and against Thomas Built Buses, the manufacturer of the bus.[2] Appellants alleged that the air brake system on the bus failed due, in part, to the school district's adherence to a defective maintenance protocol established by Bendix. Appellants presented over fifty witnesses during the trial.

The defense presented evidence indicating that there was no evidence of brake failure. The defense further asserted that the accident occurred due to a pedal misapplication. Pedal misapplication occurs when the driver thinks he or she is depressing the brake but is actually pressing the accelerator. Defendants presented evidence that the accident was consistent with this phenomenon. The jury returned a verdict in favor of the defendants. Appellants filed a motion for a new trial and requested a hearing on the issue of juror nondisclosure. Appellants subpoenaed two jurors who testified at the hearing. The trial court did not issue a ruling and Appellants' motion was denied by operation of law. Appellants timely appealed, alleging five points of error.

Further relevant facts are set forth below as necessary.

### ANALYSIS

In their five points on appeal, Appellants allege that the trial court erred in denying their motion for a new trial, based on (1) allegations of intentional nondisclosure by a

---

[2]Other defendants were dismissed prior to trial and are not relevant to the issues raised in this appeal.

juror; (2) the admittance of testimony of Appellants' withdrawn experts Timothy Reust ("Reust") and Stephen Irwin ("Irwin"); (3) allowing an adverse inference to be argued during closing argument regarding Appellants' failure to call Reust and Irwin; (4) the exclusion of evidence regarding experimental brake test results; and (5) the admittance of testimony from expert witness Mark Edwards ("Edwards") as to standard of care and causation issues attributable to the driver.

## POINT I - JUROR NON-DISCLOSURE

In Point I, Appellants allege that the trial court erred in denying their motion for a new trial "on grounds of juror misconduct because intentional nondisclosure during *voir dire* deprived appellants of a fair and impartial jury in that juror [C.D.][3] failed to disclose that he was familiar with the product at issue, his brother-in-law is an attorney, he held a negative belief as to the civil justice system and he had worked as a mechanic on trucks and buses."

### Standard of Review

We review the trial court's ruling on a motion for a new trial based on juror nondisclosure for an abuse of discretion. *Johnson v. McCullough,* 306 S.W.3d 551, 555 (Mo. banc 2010) (internal citations and quotation marks omitted).  "A trial court abuses its discretion if its ruling is clearly against the logic of the circumstances then before the court and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.*  "When a motion for new trial is denied by operation

---

[3]We refer to all jurors by initials to protect their privacy.

4

of the statute[4] it must be presumed that the trial court and counsel knew and intended the consequences of their failure to act." *State ex rel. Div. of Family Serv. v. Duncan,* 782 S.W.2d 457, 461 (Mo. App. S.D. 1990). We treat such a denial as though the trial court issued a formal order denying the motion. *Id.* Therefore, all facts are considered in the light most favorable to the denial of the motion. *Smith v. Brown & Williamson Tobacco Corp.,* 410 S.W.3d 623, 639 (Mo. banc 2013).

## Discussion

"In addressing a motion for new trial based upon juror nondisclosure, the trial court must first determine whether a nondisclosure occurred and, if so, whether the nondisclosure was intentional or unintentional." *Bell v. Sabates*, 90 S.W.3d 116, 120 (Mo. App. W.D. 2002) (citing *State v. Mayes,* 63 S.W.3d 615, 625 (Mo. banc 2001)).

"If a juror's thoughts are the same as his *voir dire* answer, then 'he has disclosed everything that the *voir dire* question requires and no nondisclosure of any kind occurred.'" *Smith*, 410 S.W.3d at 644 (citing *Wingate v. Lester E. Cox Med. Ctr.*, 853 S.W.2d. 912, 916–17 (Mo. banc 1973)).

> Intentional nondisclosure occurs: 1) where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and 2) where it develops that the prospective juror actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable. Unintentional nondisclosure exists where, for example, the experience forgotten was insignificant or remote in time, or where the venireman reasonably misunderstands the question posed.

*Bell*, 90 S.W.3d at 120 (citations and quotation marks omitted).

---

[4]Section 510.360; *see also* Rule 78.06.

"The trial court is afforded significant discretion in determining whether a nondisclosure was intentional or unintentional, and its decision in this regard will not be reversed on appeal absent an abuse of that discretion." *Id.*

## A. JUROR C.D.'S RESPONSES IN *VOIR DIRE* REGARDING AIR BRAKES

Appellants argue that one of the jurors, C.D., intentionally failed to disclose certain information both during general *voir dire* and during a follow-up *voir dire* directed specifically to him. *Voir dire* was conducted over the course of many days. The record shows that C.D. responded in *voir dire* to several questions regarding his experience with air brakes:

**First Response: TR 734-736**

Plaintiffs' counsel: Anyone on this jury panel have any specific experience, training or education **as a mechanic** for heavy commercial vehicles such as those using air brakes, heavy trucks, buses, transit buses? Anyone among you?
Right behind you is No. 39, [C.D.], Mr. [C.D.].

C.D.: Yeah, **I know how they work. I've worked with them a lot, but it's been a long time ago.**

Plaintiffs' counsel: **Did you work with air brake systems**?

C.D.: **Air brakes and boosters and all that.**

**Plaintiffs' counsel: It sounds like you know the whole deal.**

C.D.: Well a little.

Plaintiffs' counsel: Yeah. Did you ever work professionally in the field, [C.D.]?

C.D.: Not just on that. I worked on heavy construction.

6

Plaintiffs' counsel: All right.  I think you know that the issue in this case is that--whether or not the air brakes on the school bus failed.

C.D.: Yes.

Plaintiffs' counsel: Would you be able to decide this case based upon the testimony that you heard in this case, without allowing some of these experiences to alter your opinion?

C.D.: Yes, what I would think.  Whether or not that's right, I don't know.

Plaintiffs' counsel: Okay.  That's all you can do.  Thank you very kindly, sir.

## Second Response: TR 782

Plaintiffs' counsel: Anyone have any **experience, themselves, working on any kind -- any type of braking system in any vehicle?**

**C.D.: Yeah, trucks and heavy equipment, all heavy duty.**

Plaintiffs' counsel: Excellent. Thank you.

## Third Response: TR 891-895

Plaintiffs' counsel: Good morning, ladies and gentlemen. . . .  I realize that at the end of the day, I went so fast, I may have missed a hand, or in this case, a paddle. And so for that reason, just reflecting, perhaps, in the evening, if you did reflect, or this morning, any of you think, "Well, I wonder if maybe I should have raised or responded to one of Plaintiffs' counsel's questions," on any subject. And I just want to give you that opportunity. And it very frequently happens that, you know, you think, "Gee, I guess I should have responded."  And I'm asking, if you do have that belief or feeling that you had, please raise your paddle and we can address that. There's no reason not to. Great. Oh, yes, [C.D.], No. 39.

C.D.: Yeah.

Plaintiffs' counsel: Thank you very much, sir, for raising your paddle.

C.D.: Yes, **I don't know if it will make any difference or not, but I have had brakes go out, you know, on the highway.**

7

Plaintiffs' counsel: You've had brakes go out?

C.D.: Yeah, **you lose your air brakes.**

Plaintiffs' counsel: Okay. On air brakes?

C.D.: Yeah.

Plaintiffs' counsel: When you were driving?

C.D.: Yeah.

Plaintiffs' counsel: Did it just come on suddenly?

C.D.: Yes.

Plaintiffs' counsel: What kind of vehicle, sir?

C.D.: A semi.

Plaintiffs' counsel: I forgot to use my voice assistance here (indicating microphone).  And when you were driving this semi, were you alone in the vehicle?

C.D.: Yes.

Plaintiffs' counsel: Was there a crash or a mishap, C.D.?

C.D.: No. Engine blew up.

Plaintiffs' counsel: The which?

C.D.: The engine blew up as a result of that, yes.

Plaintiffs' counsel: Of the brake failure?

C.D.: Yeah.

Plaintiffs' counsel: How long ago was it?

C.D.: '71.

Plaintiffs' counsel: That's quite a long time ago.

8

C.D.: Yeah.

* * *

Plaintiffs' counsel: You understand what the allegations are in this case.

C.D.: Yeah.

Plaintiffs' counsel: There's no secret that we expect there to be considerable evidence of brake failure on the bus.

C.D.: Yeah.

Plaintiffs' counsel: And given that this happened a long time ago, and -- you were not hurt, were you, sir? You weren't hurt or injured?

C.D.: No, not at all.

Plaintiffs' counsel: And the brakes did fail on the air brakes of that large vehicle.

C.D.: Yeah.

Plaintiffs' counsel: Do you think you could set it aside, or do you think, "This is too close to home, I'm not comfortable"?

C.D.: No, I just know what happened. That's all. I don't think it would have any effect, but --

Plaintiffs' counsel: Okay. Without getting into the details, you were able to confirm, or someone was able to confirm, after the fact, those brakes went out. I don't want to get into details. It's not appropriate. But is that an accurate statement?

C.D.: Yes.

## Fourth Response: TR 913

Plaintiffs' counsel: And now we are back to C.D.

9

C.D.: Yes I was in the operating engineers for 49 years--47 years. I've been retired for 12 years. Married for ten. Moved to the area about ten years ago. No kids.

**Fifth Response: TR 949**

Plaintiffs' counsel: We have had, I think, one panel member, [C.D.], and maybe I'm wrong, who had indicated that he had had the experience of driving a vehicle when the brakes failed. And, [C.D.], it is truly terrifying, isn't it?

C.D.: Very.

Plaintiffs' counsel: Isn't it?

C.D.: Yes.

**Sixth Response: TR 1150**

Plaintiffs' counsel: Do we have any union members on the jury? . . . I want the union and the number.

C.D.: Operating engineers, 139.

**Seventh Response: TR 1456-1457**

Defense counsel: Anybody else on the panel heard or familiar with the term "pedal misapplication"? Stepping on the accelerator when they intended to step on the brake? Any panel members? No hands. Anybody have that experience personally, or any close family member ever have an experience where they intended to step on the brake of their vehicle, but instead stepped on the gas or accelerator? [M.W.], I think you told us that earlier. And, [C.D.].

C.D.: Yes.

Defense counsel: Tell me about that experience.

C.D.: Just something you do every once in a while, but it wouldn't last any time, you know. You hear about it all the time.

Defense counsel: That's No. 39. I'm sorry. Say that again.

10

C.D.: Well, it's -- I've done it different times, but just for an instant. But you hear about it all the time. Somebody runs through the garage wall.

Defense counsel: Speak up, sir. You have to be louder.

C.D.: Somebody will run through a garage wall or garage door or things like that, but -- I've done it myself a couple of times, but not to hit anything or -- just for an instant.

Defense counsel: Thank you.

## Eighth Response; Follow Up *Voir Dire*: TR 1802-1806

Plaintiffs' counsel: This is always kind of a special question because this is the last time that I will speak with any juror, any panel member, because the next time that I'll address any of you will be in your capacity as real jurors. . . . And as my last conversation with any panel member, I would very much like to speak with you, No. 39, [C.D.] Good afternoon. And may I approach and give you the microphone?

C.D.: Whatever.

Plaintiffs' counsel: . . . My question to you was, I think you had mentioned that you were an operating engineer. Would you tell us what kind you were and what you did?

C.D.: I run heavy equipment, all kinds of heavy equipment.

Plaintiffs' counsel: Could you give us some examples, [C.D.]?

C.D.: Scrapers, dozers and loaders, cranes. I'd drag lines. Just that, I guess. And, of course, I drove trucks, moving tractors, moving equipment.

Plaintiffs' counsel: Okay. You had mentioned in my notes, that you have had -- you've used air brakes, of course.

C.D.: Yeah.

Plaintiffs' counsel: Kind of -- probably **have a pretty good idea how they work.**

C.D.: **All air brakes, yeah.**

11

Plaintiffs' counsel: And you mentioned that you have had an air brake failure.

C.D.: Yes.

Plaintiffs' counsel: We've already talked about that. But other than the fact that the brakes didn't work, is there anything else -- was there anything else that told you that it was brake failure, and not some other reason that the vehicle would not stop? It was only brake failure?

C.D.: It was air, loss of air.

Plaintiffs' counsel: Okay. Having had that experience, and being among a very few on this panel that have had an actual air brake failure, I'm going to come right at you.

C.D.: Okay.

Plaintiffs' counsel: You probably know where I'm going. Assuming the facts will be that there was a brake failure here, and under the circumstances, a crash occurred. Enough said about it. Do you follow me?

C.D.: Yeah.

Plaintiffs' counsel: Your situation, you had an air brake failure and there was no fatality, true?

C.D.: No crash, no.

Plaintiffs' counsel: No crash, nobody injured, no kids injured, right?

C.D.: Right.

Plaintiffs' counsel: [C.D.], would you in the back of your mind think, "Well, both air brake failure. Both CDL drivers. If I -- if I, [C.D.], had been driving that school bus, I think I might have been able to do something different"? Could that enter your mind? Do you see my concern?

C.D.: I don't know what happened yet.

***

12

Plaintiffs' counsel: You think it might be possible that -- possible that in the back of your mind, that there could enter some thought or, based on your experience, that you could not effectively dislodge when you go into the jury room, about your prior experience with air brake failure?

C.D.: No, I -- you know, I -- I forgot even about that.

Plaintiffs' counsel: Okay. I understand. Could you, sir, apply that burden of proof that I had mentioned to the other jurors, that we expect Judge Chamberlain to apply to the jurors if you're selected to be on this jury, 51 percent?

C.D.: Yes.

Plaintiffs' counsel: No problem with applying that standard?

C.D.: None.

Plaintiffs' counsel: Okay. Thank you, [C.D.]. And thank you once again all panel members. And thank you, Your honor. I have nothing further.

## Ninth Response:  TR 1837-1840

Defense counsel: Okay. Fair enough. Thank you. Mr. -- sorry, [C.D.], Plaintiffs' counsel had asked you about this -- No. 39, I'm sorry.

C.D.: Yeah.

Defense counsel: Plaintiffs' counsel had asked you about an incident involving a brake loss due -- you said it was due to a loss of air in the air brakes?

C.D.: Yes.

Defense counsel: And how long ago did that occur?

C.D.: It was 1971, I think.

Defense counsel: So in that episode, is it fair to say there was a loss of brakes, and it was fairly identifiable that the loss of -- the loss in braking was due to a rupture or a hole in the air hose?

C.D.: Yeah, broke clear off.

Defense counsel: And has that been your only loss of any type of braking capacity that you've ever had?

C.D.: No, I've had it happen on a couple of road graders, too.

Defense counsel: And what were the issues with the loss of brakes on the road graders?

C.D.: One of them just didn't have brakes on it. It sounded like it did. With the brakes, you have the air release and that. And I pulled out on the road, and --

Defense counsel: So nobody --

C.D.: -- no brakes.

Defense counsel: Somebody doing the repair, did a faulty repair?

C.D.: Didn't repair it at all, yeah.

Defense counsel: And what was the other issue?

C.D.: The other one, the brakes just went out on it. I don't know what happened to it.

Defense counsel: You never heard what the investigation was that was -- what the result of that was?

C.D.: No, it's so -- contractors don't worry much about that because I wasn't on a job. Doesn't make any difference. You know, you have that big blade that will stop you. But out on the road, you have to have brakes.

Defense counsel: Okay. Fair enough. And this -- this incident with the loss in the air, were you the one that was able to identify that the brakes failed due to a hole or rupture in the air line?

C.D.: Well, you could hear it.

Defense counsel: You could hear it.

C.D.: You could hear it.

14

Defense counsel: And the braking in these vehicles, these heavy vehicles that you've driven, the brakes -- even when they are working properly, do the brakes make noises or --

C.D.: Just the air release.

C.D. explained his experience on the topic of brakes, trucks, sudden air brake failure and with operating and working on heavy equipment nine times throughout *voir dire*.

Appellant's counsel displayed Exhibit 3, which is an exemplar of an automatic slack adjuster brake part, during *voir dire* and specifically asked if any juror was aware of what the exhibit was or had ever worked with or seen one before. C.D. did not raise his hand or respond to any of the questions regarding Exhibit 3.

## B. JUROR C.D.'S RESPONSES IN *VOIR DIRE* REGARDING FAMILY MEMBERS IN THE LEGAL PROFESSION AND BELIEFS REGARDING THE JUDICIAL SYSTEM

Appellants posed the following questions to the venire panel regarding whether they had "family members" who were attorneys.

Plaintiffs' counsel: Do we have anyone -- we've had some reference to this, but do we have anyone on this panel who has had any type of specialized legal training or family members who are within the legal field? Anyone? Yes, we do have some responses here. TR 742

***

VENIREMAN C.: I'm not sure if this applies. My sister-in-law is employed with Lathrop & Gage.

Plaintiffs' counsel: Okay. Very well. Thank you very much. Yes, Mr. R., No. 8.

VENIREMAN R.: The question was, are you related to an attorney?

Plaintiffs' counsel: Do you have any in your family, yes, sir. TR 749

15

At this point, Appellants' counsel clarified for the panel that the question referred to "family members." TR 749. C.D. did not respond to this Appellants' counsel's question regarding family members with legal experience.

## C. JUROR C.D.'S RESPONSES IN *VOIR DIRE* REGARDING PRIOR LITIGATION

**Tenth Response: TR 1670-1671**

Defense counsel: This is -- this is a -- this was asked by Plaintiffs' counsel, but, frankly, I need to re-ask it. And I hope this doesn't take much time, but it's important. And this actually has to do with the issue of other claims or lawsuits, and there's a specific question that I need to ask. Other than a divorce or domestic relationship case, has anyone here ever been a plaintiff or defendant in any lawsuit? And if you have, please put your paddle up. And is there anybody in the jury box? Okay. And let me go down the line. Defense counsel: Okay. That's fine. Anybody else? And C.D. Okay.

**Eleventh Response: TR 1677**

Defense counsel: Very good. No. 39.

C.D.: I was a defendant.

Defense counsel: In a civil case?

C.D.: Yeah, in a civil case.

Defense counsel: That's all I need to know. Approximately what year, C.D.?

C.D.: It was probably 15 years ago.

Defense counsel: 15, one-five?

C.D.: Yeah.

Defense counsel: Very good.

16

Following *voir dire*, neither side moved to strike C.D. for cause nor did any party use a peremptory challenge on this juror.

## D. POST-TRIAL INTERVIEWS OF JURORS

Following the verdict, Appellants hired a private investigator, Valerie Summer ("Summer"), to interview the jurors and take statements from them concerning their verdict. Following juror complaints, including complaints by C.D., that they were being harassed by Summer after the trial, the court ordered the interviews to cease. Summer conducted a telephone interview with C.D. As he answered questions, Summer recorded his responses but shortly after the interview began, Summer told C.D. that she had run out of tape in the recorder. At some point after the telephone interview, Summer brought a typed copy of the interview to C.D.'s home. He read and initialed the pages of the typed copy of the interview that Summer presented to him. Summer asked him to have the statement notarized, but he refused to do so.

C.D. testified that the draft he initialed was different than the one presented to him at the post-trial hearing. The draft he was shown at the hearing did not have blank spaces like the original, and did not state that the tape had stopped recording. It also did not contain "all of the questions."[5]

The Appellants' motion for a new trial likewise did not include C.D.'s statement as a document in support. Attached to the motion for new trial were two affidavits from

---

[5]The copy of the statement used in the hearing during the questioning of C.D. was not marked as an exhibit or admitted into evidence. It is therefore not contained in the legal file for our review. The discrepancies cited are based on C.D.'s testimony at the post-trial hearing.

Summer; one described information she had obtained *about* a different juror ("C.U."),[6] and the second contained information she had obtained *about* juror C.D. (as opposed to information *from* C.D.). The details contained in Summer's affidavit were vehemently disputed by C.D. when he testified at the post-trial hearing on the motion for a new trial.

**E. C.D.'S TESTIMONY AT THE HEARING ON MOTION FOR A NEW TRIAL**

At the hearing, which took place five months after jury selection, C.D. was questioned at length about his responses in *voir dire*. The first area of questioning at the post-trial hearing was on the topic of whether he had intentionally failed to disclose that his brother-in-law was an attorney.

> Plaintiffs' counsel: Did you understand, sir, that this question was specifically asking about family members who were within the legal field? Did you understand that?
>
> C.D.: Yeah.
>
> Plaintiffs' counsel: And you understand that that specifically included both brothers-in-law and sisters-in-law, didn't you, sir?
>
> C.D.: No, I didn't.   TR 9764-65

Later, C.D. indicated that his brother-in-law had been a criminal defense lawyer in California and had been retired from the practice of law for many years. The following exchange then took place:

> Plaintiffs' counsel: All right. This is not a case where you simply forgot that you had a brother-in-law, your sister's brother [sic], who was a lawyer, true?
>
> C.D.: Yeah, I said that before.

---

[6]On appeal, Appellants only allege nondisclosure with regard to C.D.

18

Plaintiffs' counsel: You didn't forget, right?

C.D.: No.

Plaintiffs' counsel: And in fact, you knew in January of 2013 when you were being questioned, and you simply elected not to disclose that information? You made that decision, didn't you, sir?

C.D.: No, I didn't make that decision in any special way. **I just don't consider him in my family.** TR 9780

And again, counsel asked:

Plaintiffs' counsel: Did you make a decision, sir, that you were not going to disclose the fact that your brother-in-law was an attorney?

C.D.: If I did, it was a long time ago, long before this trial. **I don't consider brother-in-laws or sister-in-laws family members.** TR 9784

\*\*\*

C.D.: **I understand that my brother-in-law is a relative. He is not in my family.** TR 9787

"Generally, for the purposes of a voir dire examination, the phrase 'immediate family' refers to one's parents, wife or husband, children, and brothers and sisters, and does not include extended or collateral relatives beyond these degrees of relation." *Banks v. Village Enterprises, Inc.*, 32 S.W.3d 780, 789 (Mo. App. W.D. 2000) (citation omitted). Indeed, "family" is frequently defined as:

> 1..a basic social unit consisting of parents and their children, considered as a group, whether dwelling together or not . . . any group of persons closely related by blood, as parents, children, uncles, aunts, and cousins; . . . all those persons considered as descendants of a common progenitor.

Family, Dictionary.com, *available at* http://dictionary.reference.com/browse/family (accessed: October 8, 2014).

Further, as noted above, "[i]f a juror's thoughts are the same as his *voir dire* answer, then he has disclosed everything that the *voir dire* question requires and no nondisclosure of any kind occurred." *Smith*, 410 S.W.3d at 644 (citation and internal quotation marks omitted). Here, with regard to this line of questioning, C.D. testified that he did not respond because he does not consider his in-laws to be "in" his family.[7] "The determination of nondisclosure is left to the discretion of the trial judge whose ruling is disturbed only by showing abuse of discretion." *Id.* We must assume that the trial court found that intentional nondisclosure did not occur regarding C.D.'s brother-in-law's status as a retired attorney.[8] "Where the trial court makes no specific findings of fact, the reviewing court must assume that all facts were found in accordance with the result reached." *Id.* at 639.

At the hearing, Appellants also focused on whether C.D. had preconceived, negative thoughts towards the jury system that he failed to disclose during *voir dire*. Appellants' counsel asked numerous questions in *voir dire* attempting to determine whether any *venire* members had negative thoughts regarding the civil justice system. C.D. did not respond to any of those questions. At the post-trial hearing, C.D. was questioned extensively regarding these issues.

---

[7]In support of their position that "family" includes in-laws, Appellants cite to our decision in *Strickland v. Tegeler,* in which we held that non-disclosure had occurred where a juror did not disclose that her husband's niece and nephew had birth defects. 765 S.W.2d 726 (Mo. App. W.D. 1989). However, *Strickland* is easily distinguished from the instant case in that counsel in *Strickland* specifically defined "immediate family" for the panel as including "not just family members, but also [including] relatives, step-siblings, adopted relatives and even close friends." Such an expansive definition was not expressed by Appellants' counsel here.

[8]Appellants' questioning of C.D. on the subject of his brother-in-law being an attorney spanned over forty pages of transcript, giving the trial court ample opportunity to assess C.D.'s credibility and to determine whether the nondisclosure was intentional or unintentional.

Plaintiffs' counsel: Do you have a belief, sir, or do you have a belief one way or another whether or not a jury system, the civil jury system has, quote, kind of outlived its usefulness, end quote?

C.D.: I know where you are now and where you are coming from now.

Plaintiffs' counsel: Yeah, and you believe that, don't you?

C.D.: No.

Plaintiffs' counsel: You don't?

C.D.: No. I question it some.

Plaintiffs' counsel: Okay. You do question it, though, right?

C.D.: Yes.

Plaintiffs' counsel: Okay. And it is your -- do you believe one way or another whether, with all the sophisticated facts -- let me make sure I get it right -- with all the sophisticated facts they have now and with all of those hired witnesses and consultants, that the average person just can't sort it all out? Isn't that your belief?

C.D.: Yeah, I do. TR 9799

***

Plaintiffs' counsel: Let's go back in time to when you showed up here in January 2013. Did you or did you not have a belief at that time that the civil jury system had kind of outlived its usefulness?

C.D.: No, I didn't believe that at that time. TR 9803-04

***

Plaintiffs' counsel: Did you believe, sir, that the civil justice system was actually skewed toward people coming in claiming money?

C.D.: No, I didn't believe that.

21

Plaintiffs' counsel: Did you sir hold in one way or another, did you or did you not, one way or another, hold certain negative opinions about a 12-person jury that you didn't tell us about during the jury selection process?

C.D.: No, I did not feel that.  TR 9805

***

Plaintiffs' counsel: And the fact of the matter is that you made up your mind before the evidence was concluded, true?

C.D.: No.  TR 9816

With regard to C.D.'s answers concerning his alleged negative views on lawsuits, the record reflects that he denied having a negative attitude regarding litigation at the time he was questioned in *voir dire*.  As for his views at the time he was subpoenaed to testify at the post-trial hearing, his view was only that he questioned the jury system "some."[9]  He specifically denied holding any negative attitudes before his experience as a juror.  He further agreed that an "average person . . . can't sort out complicated facts" that require expert witness testimony, which is not a negative view.  Consequently, the only evidence Appellants presented regarding C.D.'s alleged attitude regarding litigation was the affidavit prepared by Summer, which C.D. refused to have notarized and which he described at the hearing as being an incomplete, inaccurate misrepresentation of what he had both stated to Summer and of the statement he had initialed.  Summer did not testify at the hearing; thus, there was no evidence presented to contradict C.D.'s testimony that he held no such negative beliefs at the time he answered questions in *voir dire*.  As for

_____

[9]At a bench conference prior to the evidentiary hearing on the motion for new trial, Respondent's counsel indicated that he had been contacted by several jurors, including C.D., indicating that they were being harassed by Appellants' investigator, and wanted the harassment to stop.  It was indicated at that time that C.D. was "almost in tears" and was very disturbed by the actions of the investigator.  This may explain C.D.'s subsequent "questioning" of the justice system.

22

the credibility of this testimony of C.D., once again, that is a determination for the trial court.

Appellants next allege that C.D. intentionally failed to disclose his experience with trucks and buses and specifically the brake systems on them.

> Plaintiffs' counsel: Would you say sir that you had a little or a lot of experience as a truck or bus mechanic?
>
> C.D.: Very little.
>
> Plaintiffs' counsel: Do you recall what you said at the time of the *voir dire*, sir, of the jury selection process as to whether you had a little or a lot of experience?
>
> C.D.: I probably said not a lot. TR 9817

***

> Plaintiffs' counsel: Do you recall sir that I was standing right here, walking in front of the prospective juror panel holding exhibit 3[exemplar of an automatic slack adjuster brake part]?
>
> C.D.: Yeah. TR 9818
>
> Plaintiffs' counsel: And at that time, C.D., preliminarily, you knew--you may not have known exactly what it was called, but you knew what this was for, true?
>
> C.D.: I had an idea what it was, but I didn't know what it was.
>
> Plaintiffs' counsel: Well, you didn't know what it was called, but you knew what it was for, correct?
>
> C.D.: No.
>
> Plaintiffs' counsel: Right?
>
> C.D.: No, I didn't know just exactly what that was for. I didn't.

23

Plaintiffs' counsel: You knew--you may not have known it was called an automatic slack adjuster because you used to refer to them as brake arms or simply just adjusters, true?

C.D.: Yes . . . It didn't look like that.  TR 9819

\*\*\*

C.D.: I never heard them called a slack adjuster ever.  TR 9821

Court:  He has already said he didn't know what it was, so he can't testify that he knew what it was for.  So the objection is sustained. You can ask it a different way perhaps. He said he doesn't know what it is.

\*\*\*

Plaintiffs' counsel: Before the end of the jury selection process, sir, at any point in time do you recall whether you raised your hand about whether or not you had any prior familiarity with this part?

C.D.: I don't think I did.

Plaintiffs' counsel: And isn't it true, sir, that you knew exactly what an automatic slack adjuster was, but you didn't understand necessarily what it was called?

C.D.: I knew what the brake arm was for.  Automatic slide [sic] adjuster, I had never heard of that until that day.  TR 9821-22

\*\*\*

Plaintiffs' counsel: And you may not have heard that it was called or referred to as an automatic slack adjuster, but you knew what this part was for, right?

C.D.: I guess I would know if it was a brake arm where it went.  TR 9823

With regard to the topic of his work on trucks and buses, we note from C.D.'s responses in *voir dire*, *supra*, that C.D. responded extensively to questions concerning his experience with vehicles, brake systems, brake failure and working on heavy equipment.

24

Moreover, C.D. was the only juror specifically re-questioned at the close of Appellants' *voir dire* with regard to his knowledge of air brakes. Notably, regarding C.D.'s knowledge of air brake systems, Appellants' counsel stated to C.D. during the initial *voir dire*: **"It sounds like you know the whole deal."** The argument that C.D. engaged in intentional nondisclosure simply because he did not positively identify an exemplar of an automatic slack adjuster when his testimony was that he was not aware of what that part was or what it was called, is less than persuasive.

The following exchange which occurred between Respondent's counsel and C.D. at the post-trial hearing further supports the trial court's finding that no intentional nondisclosure occurred:

> Defense counsel: Every time that you answered the question, you did to the best of your ability fully, accurately and completely, true?
>
> C.D.: Yes.
>
> Defense counsel: And that would include the questions with respect to automatic slack adjusters, correct?
>
> C.D.: Absolutely.
>
> Defense counsel: I think you indicated then, if I heard you right--let me grab my notes--that the exhibit 3 that Plaintiffs' counsel has held up, it did not look like this or whatever you were thinking of, you had never seen this component before?
>
> C.D.: Never seen anything with those side rods on it like that.
>
> Defense counsel: So what I'm holding in my hand, which is the automatic slack adjuster, it is a fair statement you had never seen this prior to jury selection?
>
> C.D.: Never. Never seen it or heard the word.

Defense counsel: And in fact, Sir, what you are also telling me is that not only you had never seen the automatic slack adjuster, you had never heard it ever being referred to as an automatic slack adjuster?

C.D.: Never.  TR 9865 -9866

The trial court is charged with judging the credibility of witnesses.  We defer to the trial court's factual findings and determinations concerning witness credibility. *March*, 417 S.W.3d at 253.  Here, the trial court made no finding of a nondisclosure by C.D., intentional or otherwise.

Based on all of the above, Point I is denied.

## POINT II - LACK OF FOUNDATION FOR REUST AND IRWIN'S OPINIONS

### Standard of Review

A trial court "enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal. *Lozano v. BNSF Ry. Co.*, 421 S.W.3d 448, 451 (Mo. banc 2014) (citing *Moore v. Ford Motor Co.,* 332 S.W.3d 749, 756 (Mo. banc 2011) (quotation marks excluded)).[10]  It abuses this discretion when its "ruling is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration."  *Id.* (citation and

---

[10]Although Appellants argue that our standard of review regarding the admission of expert testimony is *de novo*, our Supreme Court has held otherwise.  Appellants cite to *Bryant v. Bryan Cave, LLP*, 400 S.W.3d 325, 331 (Mo. App. E.D. 2013), which in turn relies on *Kivland v. Columbia Orthopaedic Group, LLP*, 331 S.W.3d 299, 311 (Mo. banc 2011) for its standard of review.  However, "a *de novo* review was appropriate in *Kivland* only because the Court was reviewing the lower court's construction of section 490.065, not because all evidentiary rulings regarding expert testimony are necessarily questions of law." *Lozano*, 421 S.W.3d at 451, n.2.  "In addition to determining whether the factors stated in section 490.065 are present, admission of expert evidence requires the trial court to apply the same standards for relevance and admissibility that apply to other types of evidence." *Id.*  The trial court's rulings are entitled to substantial deference regardless of the type of evidence being offered. *Id.* (citation omitted).

26

quotation marks omitted). "If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion." *Id.* (citing *St. Louis Cnty. v. River Bend Estates Homeowners' Ass'n,* 408 S.W.3d 116, 123 (Mo. banc 2013)).

## Discussion

Appellants argue that the trial court erred in allowing excerpts of the deposition testimony of expert witnesses Reust and Irwin to be read to the jury after Appellants orally withdrew them as experts. Appellants challenge the admissibility of the excerpts based on lack of foundation for their expert opinions, pointing out that Respondents did not lay the foundation for Reust and Irwin to testify as experts when Appellants produced them for discovery depositions prior to trial. Appellants also contend that because they had stipulated with Respondents that neither side would mention withdrawn experts, the trial court erred in allowing the testimony of these two withdrawn experts to be read to the jury.

Of particular import to this analysis, Appellants did not withdraw their designation of these two witnesses as experts until after the fourth week of trial. That same day, Appellants filed a motion *in limine* to prevent the defendants from reading the deposition testimony of either witness, of which line/page designations had been provided to Appellants prior to trial.[11] Further, prior to withdrawing them as experts, Appellants (1) during opening statements, played for the jury two accident reconstruction animations

---

[11]The trial court heard Appellants' argument on their motion *in limine* after the lunch recess and promptly denied it.

27

that were created by these same experts, (2) represented to the court they would lay the foundation for these animations when they produced the experts live during their case-in-chief, (3) established during their case-in-chief that Appellants' other experts relied upon the opinions of Irwin and Reust in reaching their opinions, (4) failed to raise any objections regarding foundation when the deposition designations were exchanged pursuant to a scheduling order prior to trial, (5) counter-designated the entire depositions of both Irwin and Reust ten days after withdrawing them, (6) continuously discussed both Irwin and Reust throughout the trial both before and after they were withdrawn as experts, and (7) failed to object to lack of foundation or the form of the questions during the deposition so that it could be corrected at that time. Based on all of the above, Respondents argue that Appellants' objection to the foundation of the opinions was waived. Respondents further contend that there was no valid stipulation in place as to Reust and Irwin because any oral agreement regarding withdrawn experts was made prior to trial when both sides withdrew various other experts and neither side anticipated the withdrawal of additional experts in the middle of trial. Finally, Respondents argue that the foundation for Irwin and Reust's opinions is found in their *curricula vitae*, which were admitted into evidence without objection.

In Missouri, the admission and exclusion of expert testimony in civil cases is governed by section 490.065, which "sets out the legal basis for admitting expert testimony." *Kivland*, 331 S.W.3d at 311. "The statute simply provides that the circuit court is responsible for determining whether (1) the expert is qualified; (2) the expert's testimony will assist the trier of fact; (3) the expert's testimony is based upon facts or data

that are reasonably relied on by experts in the field; and (4) the facts or data on which the expert relies are otherwise reasonably reliable." *Kivland*, 331 S.W.3d at 310-11 (citing section 490.065). Indeed, the court, when referring to section 490.065, stated that "[t]hose straightforward statutory words are all you really need to know about the admissibility of expert testimony in civil proceedings." *Kivland*, 331 S.W.3d at 311 n.14 (citation omitted).

> An abuse of discretion occurs if the court erroneously finds that the requirements of the expert witness statute are not met. *If the trial court finds that the expert is qualified by knowledge, skill, experience, training, or education, that the expert's testimony will assist the trier of fact, and that the facts or data the expert uses are reasonably relied on by experts in the field and otherwise reasonably reliable, the trial court must admit his or her testimony*, and if not, it must be excluded. In deciding whether the facts and data on which the expert relies are otherwise reasonably reliable, the circuit court independently assess[es] their reliability. This is a straightforward application of the statute.

> In deciding whether to admit an expert's testimony, the circuit court is required to ensure that all of the statutory factors are met; however, the court is not required to consider the degree to which they are met. So long as the expert is qualified, any weakness in the expert's knowledge is for the jury to consider in determining what weight to give the expert.

*Kivland*, 331 S.W.3d at 311 (citations and quotation marks omitted) (emphases added).

Appellants argue that there was no foundational testimony in the deposition. However, Appellants themselves used the experts' opinions in both opening statement and in the examination of other witnesses throughout trial. In opening, Appellants played accident reconstruction video animations that the experts had created and promised to lay the foundation later, when they called the experts during the trial. In their case-in-chief, Appellants elicited from their other experts that those experts relied on the testing and

29

deposition testimony of Irwin and Reust in forming their own opinions. Appellants also cross-examined defense expert witness, Richard Radlinski ("Radlinski"), extensively regarding the work and opinions of Reust and Irwin. Appellants specifically asked Radlinski about the work done by Appellants' "brake team," whether he had read the deposition of Reust, whether he knew that Reust had measured the brakes during testing, and whether he knew that Reust performed pedal force testing. The depositions of Reust and Irwin were not offered by Respondents until after these and other references to their testimony had been made by Appellants.

In Respondents' case-in-chief, the *curricula vitae* of both experts were offered and admitted into evidence by Respondents, without objection from Appellants. The *curricula vitae* for the experts contained the foundational requirements concerning the overall qualifications of Irwin and Reust.[12] Thus, the *curricula vitae* provided the court with the necessary information for evaluating whether the expert is qualified "by knowledge, skill, experience, training, or education." Section 490.065 states:

> 1. In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
>
> 2. Testimony by such an expert witness in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.
>
> 3. The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or

---

[12]The trial court took them home in the evening and read the entire depositions of both experts prior to ruling that their testimony could be admitted.

30

before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

4. If a reasonable foundation is laid, an expert may testify in terms of opinion or inference and give the reasons therefor without the use of hypothetical questions, unless the court believes the use of a hypothetical question will make the expert's opinion more understandable or of greater assistance to the jury due to the particular facts of the case.

This court has routinely looked to an expert's *curriculum vitae* as part of its analysis of whether an expert is qualified. *See Messina v. Prather*, 42 S.W.3d 753, 763 (Mo. App. W.D. 2001); *Sparks v. Sparks*, 417 S.W.3d 269, 279 (Mo. App. W.D. 2013). In addition, Appellants had already elicited testimony from their other experts that they had relied upon the opinions of Reust and Irwin in formulating their own opinions. Therefore, the requirement of section 490.065.3 regarding whether the material was reasonably relied upon by other experts in the field, was met.

Finally, Appellants allege that because the opinion testimony elicited in the depositions was not stated to be "within a reasonable degree of scientific certainty," this aspect of foundation for their testimony was not met. Appellants did not argue any issue concerning the form of the questions posed to Irwin and Reust, or the form of their answers, in their motion for new trial. Any such arguments are accordingly waived, Rule 78.07(a), and Appellants are entitled to only plain error review of this issue. Pursuant to Rule 57.07, such objections must be made at the time the deposition is given or they are waived. "The rule serves to give questioning counsel an opportunity to rephrase the question, lay a better foundation, or clarify the question so that evidence will not be rejected at trial because of inadvertent omissions or careless questions." *Seabaugh v.*

31

*Milde Farms, Inc.,* 816 S.W.2d 202, 210 (Mo. banc 1991) (citations omitted). "Waiting until trial to raise the objections amounts to a waiver of the claims that the answers should not have been admitted because they were too speculative and conjectural." *Id.* If Appellants had raised these objections during the deposition, Respondents may well have rephrased the questions and avoided this issue all together. By failing to timely object or to challenge the expert's opinions at the time of the depositions, Appellants have waived this issue regarding the admissibility of the experts' opinions. *Sanders v. Ahmed,* 364 S.W.3d 195, 209 (Mo. banc 2012).

For all of the above reasons, we find no error in the trial court's ruling admitting the expert opinion testimony of Reust and Irwin into evidence. Point II is denied.

## POINT III - ADVERSE INFERENCE

### Standard of Review

In Point III, Appellants allege that the trial court committed reversible error by allowing Respondents to argue an adverse inference in closing argument based on Appellants' failure to call Reust and Irwin as witnesses during the trial. We review the trial court's ruling in closing argument for an abuse of discretion. *Nelson v. Waxman*, 9 S.W.3d 601, 606 (Mo. banc 2000) (citation omitted). "Counsel is traditionally given wide latitude to suggest inferences form the evidence on closing argument." *Id.* The trial court has broad discretion to determine whether a particular line of argument is proper. *Boshears v. Saint-Gobain Calmar, Inc.*, 272 S.W.3d 215, 227 (Mo. App. W.D. 2008) (citation omitted). In exercising its discretion, the circuit court is in "the best position to

appraise the consequence of argument."  *Id.* (citation omitted).  The appellate court may intervene only if it concludes that the trial court abused that discretion.  *Id.*

### Discussion

Appellants lodged their objection during Respondents closing argument after counsel for Respondents stated the following:

> Defense counsel: In the opening statement there was a comment, No. 1, Mr. Irwin, that the impact at the Gleason vehicle was at least 60 miles an hour. And I wanted to point that out because I don't know if you noticed it, but there has been an effort going on in this case to not bring you information about the accident reconstruction. Why was it that we were in this trial for six weeks and Plaintiff never put on their own accident reconstructionist?
>
> Plaintiffs' counsel: Objection, Your Honor. That's equally accessible by both parties.
>
> Court: Sustained.
>
> Plaintiffs' counsel: Ask the jury to disregard the improper argument, Your Honor.
>
> Court: Overruled.
>
> Defense counsel: Mr. Irwin, we called him in our case.
>
> Plaintiffs' counsel: Same objection, Your Honor.
>
> Court: Overruled.
>
> Defense counsel: We called him in our case, and we read his opinions to you. Plaintiffs didn't do that. We read his opinions to you --
>
> Plaintiffs' counsel: Objection, Your Honor. That is a violation of the rule.
>
> Court: Overruled.  TR 9480

The second objection made by Appellants during closing was when Respondents referred to "testing they didn't bother to show you in their case."  Appellants objected

33

stating only "equally available." The court sustained this objection as to the testing. Appellants objected a third time when Respondents again referred to testing that Appellants "didn't bother to show" in their case. The objections to the testing that Appellants "didn't bother to show" were sustained.

Prior to rebuttal, Appellants reminded the court that it had sustained their objections when Respondents commented that Appellants had never put on their own accident reconstructionist during trial. The following exchange then took place:

Court: What relief do you seek?

Plaintiffs' counsel: We wish to argue in retaliation, that our sole purpose, in view of the length of the trial, was to reduce the trial dates, that we had stated this to Court and counsel, and that any contrary argument in terms of Plaintiffs wanting to hide any evidence from the jury, is false. And we believe that is a fair argument in retaliation because it is the only way to reasonably respond in a rationale way to what the inference given by Defense counsel is, is that we tried to unfairly hide information. So we think that this is not an outlandish request. We're not seeking that the Court instruct the jury. We could. But I don't know that the Court would necessarily do that. So we seek to make that argument, that the situation was not represented accurately. Again, that we stated to the Court and counsel that we did withdraw them for the stated purpose to reduce the trial days, and that the Court ruled that those were equally available, and that any contrary argument is false.

Court: So you want to be able to say something to the effect that the reason you didn't call them is because you were just trying to move things along.

Plaintiffs' counsel: Precisely.

Court: Was there a second part of your request?

Plaintiffs' counsel: Yes, Your Honor. And any argument to the contrary is false, and to make reference to the fact that the Court sustained that objection, that was what that was all about. And that would be our requested relief.

34

TR 9526-27

"[T]he trial court has broad discretion in the area of closing arguments; such discretion is not lightly to be disturbed on appeal." *Midwest Materials Co. v. Village Dev. Co.,* 806 S.W.2d 477, 492 (Mo. App. S.D. 1991) (citation omitted). The court permitted Appellants to tell the jury that they did not call the two experts mentioned by Respondents because they were trying to move things along and shorten the length of the trial. They were not allowed to remind the jury that the court had twice sustained their objection or say that any argument to the contrary was false. They were also not allowed to tell the jury that they had informed the court and counsel of the reasons for not calling those two experts because, as the court pointed out, the Appellants "didn't do that."

Because the court sustained the objection and granted the relief that the Appellants sought, that is, the ability to address the adverse inference in rebuttal, the court did not err. Appellants did not move for a mistrial. To the extent that Appellants are asserting error in being prohibited from reminding the jury that their objection was sustained, the jury already heard the objection and the court's ruling.

Further, the fact that the Appellants relied heavily on the opinions of these two experts in their opening statement and throughout their case-in-chief and only withdrew their designation of these experts following four weeks of trial, and, after withdrawing them as experts, once again played Irwin's accident reconstruction animation during their own closing argument, cuts against their argument that the experts were "equally available." An expert witness is deemed to be in the control of the party who has retained that expert. *Hancock v. Shook,* 100 S.W.3d 786, 797 (Mo. banc 2003). It is less than

35

compelling that a party can have an expert under his control until the trial is almost completed and then withdraw his expert designation and later argue that the witness was "equally available" to both parties.

Finally, by promising to produce these experts during the trial in the opening statement to the jury and then failing to do so, it is clearly proper for Respondents to comment about the failure to do so in their own closing argument. *Robinson v. Empiregas, Inc.*, 906 S.W.2d 829, 838 (Mo. App. S.D. 1995).

In sum, the only relief Appellants sought was for permission to give a reason during closing rebuttal for not calling their accident reconstructionists. The court granted that relief. "[B]ecause the trial court granted all the relief requested . . . there is no adverse ruling for our review." *State v. Morgan*, 366 S.W.3d 565, 583-84 (Mo. App. E.D. 2012) (citation omitted). Moreover, Rule 84.13(a) provides that "allegations of error not presented to or expressly decided by the trial court shall not be considered in any civil appeal from a jury tried case."

For all of the above reasons, Point III is denied.

## POINT IV - BRIDGEMAN EXPERIMENTAL BRAKE TESTING

### Discussion

In Point IV, Appellants argue that the trial court erred in excluding evidence of the results of "comprehensive brake testing" on a bus similar to the one involved in this accident which was conducted by one of their witnesses. Appellants contend that the proper foundation was laid which showed that the testing was performed under

36

substantially similar conditions to the operations of the school bus involved in the accident.

"The foundation for the admission of experimental tests requires a showing that the test, in material aspects, has the requisite similarity to the conditions or occurrences at issue in the suit." *Turner v. Fuqua Homes, Inc.*, 742 S.W.2d 603, 614 (Mo. App. W.D. 1987). "However, substantial similarity is a flexible concept, depending upon what conditions are important to control." *Id.* (citation omitted). The admissibility of experimental evidence is within the sound discretion of the trial court; the court's ruling will not be disturbed on appeal absent a clear showing of abuse of discretion. *Id.* (citation omitted).

Before trial, Respondents filed a motion *in limine* to exclude the experimental testing that Appellants intended to offer into evidence. One of the main theories of Appellants' case was that although the brakes on the bus were equipped with automatic slack adjusters, Bendix had sent outdated maintenance materials to the District's mechanics, indicating that the slack adjusters should be manually adjusted, even though they were designed to adjust themselves automatically. Appellants argued that the manual adjustments caused the brake failure in this accident.

The testing at issue involved a retired school bus driver, Daniel Bridgeman ("Bridgeman"), whom Appellants hired to drive a school bus that was the same type as the bus involved in the accident. Another witness, David Peck ("Peck"), designed and supervised the testing. Bridgeman was to drive the bus out in the country, simulating stops as if stopping at bus stops. The maintenance on the bus's brakes was to mimic how

the actual bus had been serviced. The trial court heard argument and preliminarily granted the motion *in limine* until such time as the foundation could be properly laid at trial. The court noted that an expert needed to provide foundation for the testing and that Bridgeman was not an expert on brake systems.

Appellants began their direct examination of Peck by laying the foundation for his qualifications as an expert on brake systems under section 490.065. There is no dispute that Peck was qualified to testify as to air brake systems. Appellants then began to lay the foundation for the experimental testing that he had supervised and about which he wished to testify. Peck testified that he acquired a bus that was the same type as the one involved in the accident. He replaced the brakes on it so that they were the same type as the ones at issue. He further described various aspects of the conditions under which the test was conducted and stated that he designed the test himself. He also testified that the driver drove the test bus for four months as if driving a school bus route, with frequent stops as if picking up children at stops. Appellants then proffered the witness on the subject of the simulated test results.

After dismissing the jury, the court heard extensive argument that carried into the next day. Respondents maintained that there were too many differences and uncertainties in the test conditions, thereby rendering the test results inadmissible. For example, a video of the replica bus showed the driver repeatedly slamming on the brakes throughout his drive, yet there was evidence that the real bus driver, Thomas, was a slow driver and was never witnessed speeding up then slamming on the brakes.

The court also noted that various pieces of information were lacking, such as a driving log. Consequently, there was no evidence as to how many miles the bus was driven, how many days per week it was driven, how fast it was driven, the number of stops it made each day or in total or what routes the driver took. Further, Peck stated that the driver only drove in the country on days with good weather.

The court found that although Appellants attempted to simulate their theory of brake wear on the replica school bus, there were too many variances, which made it not "substantially similar" to the real bus's mechanical operation. The court noted that the brakes on the replica bus were only manually adjusted for wear five or six times, whereas the facts in evidence were that the brakes on the real bus had been manually adjusted thirty to forty times. Further, the court maintained that if one of the purposes of the test was to get the brakes on the replica bus to begin "squealing," then there would be no evidence to equate the squeal the test bus was making with whatever noise witnesses heard coming from the brakes of the actual bus on its daily route before the accident. The court noted that, as to the squeal noise the Appellants were trying to duplicate, that there was "no way to do a proper cross-examination" on that either.

Our Supreme Court addressed a similar situation in *Richardson v. State Highway & Transportation Commission*, 863 S.W.2d 876 (Mo. banc 1993). There, a party wanted to introduce a computer simulation of an accident. *Id.* at 881-82. After extensive argument, the court remained "concerned that many of the basic facts underlying the simulation were not known or reasonably certain, but rather [were] 'variables.'" *Id.* at 882. Despite the proponent having presented "significant testimony from the expert who

39

conducted the simulation," the trial court excluded it. Our Supreme Court found no abuse of discretion in that ruling. *Id.*

Here, based on the evidence, it was within the discretion of the trial court to determine that the differences rendered the simulated test as having not been performed under substantially similar circumstances. "[I]f reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion." *Id.* (citation omitted). "Even if the trial court has abused its discretion in excluding evidence, this Court is loathe to vacate a jury's verdict and resulting judgment on such grounds." *Lozano*, 421 S.W.3d at 451.

Point IV is denied.

## POINT V - HUMAN FACTORS EXPERT

### Discussion

Appellants contend that the trial court erred by admitting the testimony of Respondents' expert witness, Mark Edwards, Ph.D., ("Edwards"), concerning "the school bus driver's standard of care and causal role in the school bus crash." In support, Appellants point to cases from courts outside of Missouri that suggest a witness must have extensive driving experience of the kind of vehicle in question in order for that witness to be qualified to opine on driving standards. Respondents contend that Edwards' testimony was within his area of expertise and that Appellants did not properly preserve their objection to this testimony.

As we have previously stated, the admission and exclusion of expert testimony in civil cases is governed by section 490.065. *Kivland*, 331 S.W.3d at 311. "The trial court

40

has discretion to determine whether a sufficient foundation was laid for the admission of evidence . . . and this Court will not reverse absent a showing the trial court abused its discretion." *Weltmer v. Signature Health Serv. Inc.*, 417 S.W.3d 856, 863 (Mo. App. E.D. 2014) (citation omitted).

Respondents called Edwards to testify at trial and began their direct examination by eliciting foundation as to Edwards' educational background and employment experience. Edwards testified that he had earned a Bachelor of Arts degree, a Master of Experimental Psychology degree, and a doctorate in Human Factors Engineering. Edwards' *curriculum vitae* was offered and admitted into evidence without objection. Edwards authored hundreds of articles in the field of human factors engineering. His employment included teaching driving instructors at Texas A&M University, working for the National Public Services Research Institute, the Allen Corporation, the National Highway Traffic Safety Administration, Star Mountain Corporation, and the Federal Motor Carrier Safety Administration. Edwards currently teaches human factors engineering classes to Ph.D. candidates at the University of Central Florida. Edwards has testified before Congress on the topics of over-the-road truck driver regulations as well as the effects of cell phone usage on drivers. He is a fellow of the Society of American Traffic Safety Information Professionals and chaired the task force on truck and bus safety for the National Academy of Science.

Despite having deposed Edwards twice, Appellants asked to *voir dire* the witness regarding his qualifications to testify as an expert. Following their *voir dire*, Appellants objected to Edwards, stating that he was not qualified to offer an opinion in two specific

41

areas: (1) "driver performance on a school bus," i.e., how the driver applied the pedals, and (2) "pedal design." Appellants admitted to the court that they were not objecting to his qualifications generally as a Human Factors expert; rather, they objected on the basis that he was not qualified to give opinions in certain areas they deemed outside his area of expertise. Although the causative role of "pedal misapplication" was first put forth by Appellants' experts during their case-in-chief, Appellants argued that Edwards had no "factual foundation" for knowing what the bus driver in this case did with her foot while she was driving.

The trial court overruled Appellants' objection. The court then noted that because Appellants were allowed to elicit expert testimony on how the accident could have happened through pedal misapplication, Respondents could respond with their theory on how it could have happened. The court concluded by noting that it would be up to the jury to decide what the driver "actually did" with her foot.

On appeal, Appellants claim error, in part, on the admittance of "standard of care" testimony. However, the transcript confirms that at trial, as noted above, Appellants directed their objections only towards Edwards' opinions regarding (1) driver performance and (2) pedal design. Regardless, a search of the record reveals that Edwards did not testify as to the standard of care for bus drivers or for this driver. Appellants specifically asked Edwards whether he was going to give an opinion as to "the driver's standard of care" to which he answered "no." The only references to "standard of care" at any point in the transcript regarding this witness were made by Appellants' counsel. Thus, to the extent that Appellants are now alleging error by the trial court for

42

allowing testimony regarding the driver's standard of care, our review of the record confirms that the witness did not offer such testimony.

The second area of Edwards' testimony challenged on appeal concerns that which would suggest "a causal role" in the accident. At trial, following their *voir dire* of Edwards, Appellants made numerous, overlapping objections[13] but eventually narrowed their objection to testimony over whether the driver could have misapplied the pedals, or "driver performance."[14] On appeal, Appellants identify the following testimony as admitted in error:[15]

> Defense counsel: Let's talk about this accident. Do you have an opinion as to whether this accident was caused by a pedal misapplication involving the foot being placed fully on the accelerator?
>
> Plaintiffs' counsel: Same objection, Your Honor. Contrary to the Court's ruling.[16]
>
> Court: Overruled.
>
> Dr. Edwards: Yes.
>
> Defense counsel: What is your opinion?
>
> Dr. Edwards: My opinion, it was a pedal error. It was an attempt on the -- it was a pedal error that's very typical as to what's seen when we look at pedal errors. It's an attempt by a person that has an intention to slow the speed of the vehicle by depressing the brake, but depresses the accelerator instead to essentially a full throttle position. TR 8552

---

[13]Argument on this issue alone spanned thirty-five pages of transcript.

[14]On appeal, we note that "driver performance" is being referred to as a "causal role." Because Appellants preserved their objection to testimony about whether the driver caused the accident through pedal misapplication, we find the objection as to causation was preserved.

[15]In their brief, Appellants identify other testimony in support of their argument that Respondents "ran right over the court's ruling" but because Appellants did not object to the additional testimony as it was received, it is not reviewable on appeal. We thus cite only to the testimony to which an objection was raised and is reviewable.

[16]Appellants' objection refers to the court's ruling that no witness could say with absolute certainty what the driver did.

The trial court again overruled the objection, having already heard argument on the issue in the form of a pretrial motion *in limine*, a renewed motion *in limine*, and in a second round of argument outside of the jury's hearing on the day Edwards testified. The court had ample information to determine that the topic of "pedal misapplication" was within Edwards' area of expertise.

As for Appellants' contention that the testimony was "contrary to the court's ruling," it becomes clear when reading the entire exchange that the court intended to prohibit both sides' experts from stating with absolute certainty what the driver did or did not do. Indeed, the court noted that "no expert" can decide what the driver did with her foot; experts can only opine as to what "could have happened" or what the accident is "consistent with."

Based on Edwards' qualifications as reflected in the record, the trial court was well within its discretion in finding that Edwards was qualified to opine as to whether the facts of the accident were consistent with pedal misapplication. Experts for both sides argued that pedal misapplication could have caused the accident. Appellants argued that BOTH the brake and the accelerator were applied at the same time; Respondents argued that only the accelerator was applied. We find no error in this ruling.

Based on all of the above, Point V is denied.

## CONCLUSION

Respondent Thomas Built Buses' motion to dismiss the appeal based on Appellants' failure to follow Rule 84.04(c) which was taken with the case, is denied. The judgment of the trial court is affirmed.

_____
Gary D. Witt, Judge

All concur